No. 26,345.

THE STATE OF KANSAS, *Appellee,* v. CHARLES H. FISHER, *Appellant.*

SYLLABUS BY THE COURT.

HOMICIDE—*Murder in First Degree—Perpetration of Felony.* Under R. S. 21-401, providing, "Every murder which shall be committed . . . in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary, or other felony, shall be deemed murder in the first degree," it is held the other elements constituting the felony must be so distinct from that of the homicide as not to be an ingredient of the homicide, convictable under an information charging the homicide as murder.

Appeal from Russell district court; JACOB C. RUPPENTHAL, judge. Opinion filed February 6, 1926. Reversed.

*Jerry E. Driscoll,* of Russell, for the appellant.

*C. B. Griffith,* attorney-general, *C. A. Burnett,* assistant attorney-general, *C. R. Holland,* county attorney, and *Oscar Ostrum,* of Russell, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: Charles H. Fisher was found guilty of murder in the first degree. He has appealed. Briefly, the story of the homicide is as follows: Defendant, about twenty years of age, the oldest of seven children, lived with his father, who was of German descent, on

Homicide, 29 C. J. p. 1107 n. 57; 13 R. C. L. 776.

a farm where he was born and reared, about seven miles south of Bunkerhill, in Russell county. His father owned the west half of the section. The house in which they lived at the time of the tragedy is near the northeast corner of the place and faces east; the old house, where the family formerly lived, is near the southwest corner of the place, where there is a well and a place for keeping stock. There is a highway through the Fisher place, laid out so as to avoid rough land. It runs from the north on the east side to about 300 yards south of the house, thence west about that distance, thence south some distance, thence west to a north and south road along the west side of the place. On January 1 and 2, 1925, there was a severe snowstorm, with wind, which drifted the snow so that the east and west roads were impassable in many places. The mail carrier and others, desiring to go through the Fisher place, had gone from the east road through the driveway by the house and angled southwest, keeping on the higher land, where fences had been laid down so travel could get through.

John M. Foley, who lived in Colorado, had been to eastern Kansas to visit relatives, and was driving home in a touring car with the side curtains on. His wife, their three young children, and his two sisters, school-teachers, were with him. He reached the Fisher place soon after noon, January 2, and drove south on the road east of the house to the first turn west. He saw the road to the west was impassable, also observed the tracks of other cars which had turned there and gone back. He cut the wires on the fence south of him and drove into a wheat field. About this time, possibly a little before, defendant and his father left the house, each had a .22 rifle, and walked in a southwesterly direction across the place. Defendant testified they were going to the south place to look after the stock and took the guns along to hunt on the way. Foley drove west in the wheat field about 250 yards, cut the wires on the fence, and drove into the north and south road on the Fisher place. He drove south to the next turn west and found that road impassable. He cut the wires on the fence to the south of him and entered a small pasture, drove west about eighty yards through the pasture, cut the wires on another fence and drove into a wheat field. He was then on higher land and drove southwesterly through the field. Defendant testified that he saw Foley cut the wires at the second, third and fourth fences, that he tried to attract his attention each time, and waved to him so as to direct him back on the road that was open through the place, but

was unable to attract his attention. At one of the fences he was only about eighty yards from Foley. Foley says when he was at the third fence he saw the two men north of him some distance; saw that they had guns; did not see them wave to him, or otherwise attempt to attract his attention, and supposed they were hunting.

After Foley drove through the fourth fence and was in the west wheat field, traveling at eighteen or twenty miles per hour, the defendant, then about 275 yards away, fired two, possibly three, shots at the automobile. He says he fired the first shot at the tires and the second shot at the gasoline tank, and does not recall that he shot more than twice; that his purpose in doing so was to stop the car and get the license number and report to the officers for the cutting of the fences. When nearing the west side of the place one of Mr. Foley's sisters noticed that the little boy, John Michael Foley, four years old, who was riding in the front seat between his father and mother, was bleeding at the temple and apparently unconscious. She called Mr. Foley's attention to it; he stopped the car, and in doing so it slid into a ditch near the road on the west side of the Fisher place. The occupants, or some of them, got out of the car, and at that time the defendant and his father were coming toward them across the wheat field, and they did come over to the car.

There is considerable discrepancy as to the nature of the language used and just what was said when defendant and his father reached the car, or thereabouts. On behalf of the state the evidence tended to show that defendant, to some extent, and his father especially, were abusive and profane; demanded of Foley to know why he had cut their fences; wanted to get the number of his car; said he had a notion to shoot "the whole damned outfit"; and used similar expressions. Defendant testified that they did demand to know why they cut the fences, and wanted to get the license number of the car, but denies any threats or other unseemly conduct. Defendant and his father were told that the boy was shot, and asked where a doctor could be reached. Defendant and his father went up to the car and looked at the boy, and the father said to defendant: "You have shot one of the little boys." It seems that defendant did but little talking after that. His father, however, told them the nearest doctor was at Bunkerhill, about seven miles away, and the way to go was back by his place. Defendant and his father helped get the car out of the ditch, and at

the request of Mr. Foley, or some one of his party, drove the car part way to the Fisher house to show them the road. When they reached the Fisher house Mr. and Mrs. Foley, the injured boy, and defendant's father went to Bunkerhill to the doctor, where the boy was treated. Later in the evening he was taken to the hospital at Hays for further treatment, but died that night from the wound received. The other members of the Foley party stayed at the Fisher place until evening, when an automobile was sent for them.

The information was in two counts. The first charged murder in the first degree, in the usual form, alleging, of course, the material facts. The second count was the same as the first, with this addition:

". . . and at said time and place aforesaid said Charles H. Fisher was engaged willfully, unlawfully, and feloniously, in the perpetration of and in an attempt to perpetrate, an assault with a deadly weapon upon one John M. Foley, Catherine Foley, Elizabeth Foley, Marguerite Foley, Leo Foley and Irwin Foley, with the willful, unlawful, deliberate, felonious and premeditated intent on the part of him, said Charles H. Fisher, to kill and murder said John M. Foley, Catherine Foley, Elizabeth Foley, Marguerite Foley, Leo Foley and Irwin Foley, and the said Charles H. Fisher did then and there so as aforesaid willfully, unlawfully, feloniously, maliciously, purposely, deliberately, premeditatedly and of and with his malice aforethought kill and murder him, the said John Michael Foley."

The defendant objected to the two counts in the information, moved to quash one or the other of them, and at the close of the state's evidence moved to require the state to elect upon which it would proceed to trial, all of which motions were overruled. Though we do not regard the matter as serious, there was no purpose in having the two counts in the information. If murder were committed in the perpetration of some other felony, the facts pertaining to that could have been proved under either count. (*State v. Roselli,* 109 Kan. 33, 198 Pac. 195; *State v. Barrington,* 198 Mo. 23, 96.) Having two counts tended to cause confusion in the instructions.

The principal complaint upon this appeal pertains to the instructions of the court. The court gave instructions pertaining to the two degrees of murder and four degrees of manslaughter, defined by our statutes, and among others, gave the following:

"12. If the defendant at the time that he fired the shots at the Foley car as testified to by him, did so purposely and of malice aforethought, with intent to kill, or maim, or if he fired the shot with intent to commit manslaughter

or any other felony upon the occupants of said car other than John Michael Foley and that a shot so fired by defendant struck John Michael Foley and caused his death, then such killing would be in the perpetration of a felony, and defendant would be guilty of murder in the first degree under count two.

"13. If the defendant at the time he fired the shots toward the Foley car as testified to by him did so with the intent to strike the tires or gas tank of said car in which the Foleys were then riding and if thereby the lives of the occupants of said car or any of them were endangered by such act on part of the defendant, and if the circumstances were such that had death ensued to any of such occupants, defendant would have been guilty of murder, or manslaughter in some degree, by defendant's act, procurement or culpable negligence, and if one of the shots so fired caused the death of John Michael Foley, then such killing would be in the perpetration of a felony and the defendant would be guilty of murder in the first degree under count two.

"15. If you find that the defendant fired a shot at the car as alleged with intent to stop the car so as to get its number but with no intent to kill said John Michael Foley or any of the other occupants of the car, and that such shooting or act of defendant was unlawful, then you should consider the various instructions already given you to determine of what degree of guilt, if any, defendant was guilty, and under which count, if either."

The verdict of the jury was that the defendant was guilty of murder in the first degree as charged in the second count. Our statute reads:

"Every murder which shall be committed by means of poison or by lying in wait, or by any kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or an attempt to perpetrate any arson, rape, robbery, burglary, or other felony, shall be deemed murder in the first degree." (R. S. 21-401.)

Appellant specifically complains of instructions 12 and 13. It is the contention of the state that if murder is committed in the perpetration or the attempt to perpetrate any other felony, it is murder in the first degree; hence, that if the boy, John Michael Foley, met his death at the hands of defendant, while defendant was committing an assault with a deadly weapon, under such circumstances that it amounted to a felony under any statute pertaining thereto, the offense is murder in the first degree. This contention cannot be sustained. The effect of it would be to make any homicide, not excusable or justifiable, which by our statute is defined to be manslaughter in any of the degrees, or murder in the second degree, to constitute murder in the first degree. In other words, there could, under this interpretation of the statute, be no such thing as any lower degree of homicide than murder in the first degree. In 29 C. J. 1107, it is said:

State v. Fisher.

"Under a statute making the unintentional killing of another while engaged in the commission of a felony murder in the first degree, the other elements constituting the felony must be so distinct from that of the homicide as not to be an ingredient of the homicide indictable therewith or convictable thereunder." (See, also, cases there cited.)

We have examined all of the authorities cited in the able brief of counsel for the state as tending to support this instruction. It will not be necessary to make a detailed analysis of them. The few which tend to support the instruction are upon statutes differing from our own and are not applicable. Those holding that a murder committed in the perpetration or attempt to perpetrate a distinct offense, as robbery, arson, or the like, are in keeping with our own decisions and are not opposed to the conclusion here reached. Here the act of the defendant in doing the shooting is either murder in the first degree or some other offense. That same act cannot be made the basis, first, of some other felony, as manslaughter, and then that felony used as an element of murder in the first degree. The fact that the jury returned a verdict of guilty upon count two of the information indicates that the erroneous instructions influenced, in part, at least, the verdict.

Only one other matter needs attention. As to what transpired after defendant and his father went to where the automobile was stopped there was testimony as to what was said by the father, which, appellant contends, the evidence disclosed was not within his hearing, and hence not binding upon him. We have examined the transcript of evidence upon this point. Each witness who testified differs from the other witnesses as to the exact location of the respective parties at the times of certain conversations, and differ as to the wording of the conversations. Perhaps there is some of this that should have been excluded, but we shall not undertake a detailed analysis of this evidence to say just which, if any, should be excluded. Upon a new trial the court can pass upon these questions as they arise under the ordinary rules of evidence pertaining to them.

Because of the erroneous instructions hereinbefore discussed the cause will be reversed for a new trial.

Dawson, J., dissenting.