No. 60,069

STATE OF KANSAS, *Appellee*, v. CLARENCE L. GRUBBS, *Appellant.*

(747 P.2d 140)

Opinion filed December 11, 1987.

*Lucille Marino*, assistant appellate defender, argued the cause, and *Benjamin C. Wood*, chief appellate defender, was with her on the brief for appellant.

*Sue Carpenter*, assistant district attorney, argued the cause, and *Gene M. Olander*, district attorney, and *Robert T. Stephan*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, J.: Clarence L. Grubbs appeals his jury trial convictions of two counts of rape (K.S.A. 1986 Supp. 21-3502) and two counts of aggravated robbery (K.S.A. 21-3427).

The sole issue on appeal is the sufficiency of the evidence supporting the convictions. In such challenges the standard of review on appeal is whether the evidence, viewed in the light most favorable to the prosecution, convinces the appellate court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. The appellate court looks only to the evidence in favor of the verdict to determine if the essential elements of a charge are sustained. *State v. Dressel*, 241 Kan.

426, 427, 738 P.2d 830 (1987); *State v. Bird*, 240 Kan. 288, 298-99, 729 P.2d 1136 (1986); *State v. McKibben*, 239 Kan. 574, 585, 722 P.2d 518 (1986).

Two separate incidents are involved in the convictions herein. Each will be considered separately. The principal issue at trial was identity.

## VICTIM S.S.

On October 22, 1985, S.S. was working as a receptionist in a Topeka optometrist's office. She was alone in the office at 4:35 p.m. when a young black man entered and stood at her desk. He stated that he had missed an earlier appointment and wanted to reschedule his appointment. While S.S. was checking the appointment book, the man moved behind her, covered her mouth with his left hand, and held a knife to her throat with his right hand. He then raped S.S., took sixty-two dollars from her purse, and left.

S.S. described her assailant as being in his early twenties, a neat-looking, well-groomed black man with a medium build, medium complexion, and fairly short hair. He was clean shaven and had no mustache. Based on her husband's height, she estimated her attacker's height and weight as approximately 5 foot 8 inches and 150 to 160 pounds. She described his clothing as a dark blousy jacket and dark baggy khaki pants. S.S. stated the man had been in the office about a week earlier.

S.S. was shown a six-picture photo lineup on the night of the attack and determined that her attacker was not among those pictured. The following week she was shown a second six-picture photo lineup and immediately identified the photograph of Clarence Grubbs as the rapist. At trial S.S. positively and unequivocally identified Clarence Grubbs as her attacker and the man who had been in the office earlier. The office had been well lighted on both occasions, and S.S. had ample opportunity to study her attacker's features. A cautionary instruction on eyewitness identification was given.

A rape kit was prepared at a local hospital. Seminal fluid was found to be present, but nothing bearing on the identity of the donor was detected.

Defendant testified as to his whereabouts on the day of the crimes, but there was no corroboration relative to the crucial time period herein.

Defendant argues that the photo lineups presented to S.S. resulted in his misidentification. Defendant appears to take the position that the photos were impermissibly suggestive, as his photo was the only one fitting the description given by the witness. We have viewed the photos and are satisfied that such was not the case. Further, defendant points out that S.S. knew the police had a suspect when she came to the police station to view the lineup. This is certainly not unusual in photo lineup situations.

After carefully reviewing the record, we are satisfied that there was sufficient competent evidence to support the guilty verdicts relative to the rape and aggravated robbery of S.S.

## VICTIM T.J.

On October 28, 1985, T.J. was working at a dry cleaning establishment in South Topeka. At approximately 6:00 p.m. a black man entered the premises and inquired about cleaning prices. T.J. asked him what type of clothes he wanted cleaned and he said it was a man's suit. The price was quoted and he turned to leave. He then brandished a knife and ordered T.J. to lock the front door, which she did. He took money from the store's cash register and money bag. He then raped T.J. and took money from her purse.

At trial T.J. testified that her attacker was a black man, approximately 5-foot-8 to 5-foot-9 inches tall and weighing approximately 150 pounds. He had no facial hair and did not wear glasses. He was wearing a black jacket with a yellow stripe on one side and military-style camouflage pants. She identified two exhibits as being the jacket and pants worn by her attacker. Testimony revealed that the jacket and pants belonged to the defendant and that the jacket had been seized pursuant to a search warrant from the defendant's bedroom approximately 48 hours after T.J. was raped. The camouflage pants had been taken from a residence the defendant was moving into at the time of the execution of the search warrant.

T.J.'s description of her attacker given to the police shortly after the commission of the crimes was consistent with her trial testimony. During the evening following the attack, T.J. viewed 50 photographs but could not identify any. The next day she

picked defendant from a group of six photos. She positively and unequivocally identified defendant at trial as her assailant. Fibers found at the scene and on T.J.'s clothing were consistent with defendant's jacket admitted at trial.

Defendant testified he had been assisting a minister to move during the crucial time period. The minister testified defendant did not arrive until approximately 8:00 p.m. Other aspects of defendant's version of the events of October 28 were uncorroborated and in some instances controverted.

T.J. was seventeen years old at the time of the offense, and an honor student at Highland Park High School. She testified that cross-racial identification was no problem for her as approximately 50 percent of the student body of her school is black. She testified that the lighting was good in the store and that she had ample opportunity to see her assailant's features. She further testified that she made a conscious effort to study the man's features so she could later identify him if given the opportunity.

A rape kit was prepared at a local hospital. It was determined by KBI forensic examiner Susan Scholl that T.J. was a secretor, and had type B blood with PGM subtype 1+. The vaginal smear showed the presence of seminal fluid and a PGM subtype 2+1+. Defendant's PGM subtype is 1+1-. Ms. Scholl testified the PGM subtype 2+ could not have come from defendant. Inasmuch as T.J. had been a virgin prior to the attack, the possibility that the 2+ subtype came from a prior donor was eliminated. Later, additional samples were taken from T.J. and defendant which confirmed their respective PGM subtypes. Obviously, the vaginal mixture present after the rape could not be replicated for additional testing.

In *State v. Washington*, 229 Kan. 47, 55, 622 P.2d 986 (1981), we concluded the Multi-System polymorphic enzyme analysis method of serological testing was sufficiently accepted as reliable by the scientific community to justify admission into evidence. PGM is one of the polymorphic enzymes analyzed in the Multi-System methodology. See *State v. Washington*, 229 Kan. at 49. Moreover, we stated as dictum in *Washington* that courts throughout the United States held admissible in criminal prosecutions blood grouping tests as relevant evidence tending to prove the identity of the accused as the criminal, to establish the

accused's presence at the scene of the crime, or to corroborate other evidence that a crime had in fact occurred. 229 Kan. at 54-55.

There was no testimony at trial relative to the degree of accuracy in PGM testing from vaginal swabs after sexual intercourse to identify or exclude donors nor as to any degrees of error in such testing. There was no testimony relative to the time lapse between the taking of the vaginal swab and the testing at the KBI laboratory.

Defense counsel submitted additional authority to this court in support of its position that defendant could not be convicted of the T.J. rape by virtue of the PGM test results. Interestingly, included in this material was an article entitled *The Typing of Phosphoglucomutase in Vaginal Material and Semen* by Price, Davies, Wraxall, Martin, Parkin, Emes, and Culliford, which appeared in Vol. 16, p. 29 of the 1976 edition of the Journal of Forensic Science Society. The article states, *inter alia*:

"These workers also studied the effects of temperature and humidity on the PGM patterns obtained from three fresh semen samples from normal donors representing the common PGM types, in both liquid and stain conditions. No anomalies were found that could be considered applicable to the situations found in forensic casework. Rees and Rothwell (1975) also examined PGM typing in seminal stains. They found one instance in which a stain made from a semen sample from a person of type PGM 1 gave a PGM 2-1 result when tested at an age of seven days. However, stains made from the same sample and tested after two and seventeen days gave a PGM 1 result. The authors offer no explanation for this finding and do not comment on the possibility that a clerical error may have been responsible.

"In the same paper, Rees and Rothwell reported results from the typing of 62 vaginal swabs taken shortly after intercourse from women attending a fertility clinic. In two instances, both of which concerned couples whose partners were of blood type PGM 1, a swab gave a PGM 2 result, and in another a PGM 2-1 result was obtained from a couple of type PGM 1. Duplicate swabs from two of these couples also gave the anomalous results. Unfortunately, there are no photographs of these discrepant band patterns in the paper and, therefore, it is difficult to assess these findings. Rees and Rothwell conclude that it is unwise to type semen on vaginal swabs by use of PGM polymorphism. However, we believe that such a decision should not be made when it is based on the results obtained from material from a clinic, as in these circumstances there can be no guarantee that the anomalies are not due to the presence of semen from a third party whose existence is unknown to the researchers.

"Furthermore, the concentration of semen on the swabs that gave anomalous results was so low that it is unlikely that the results were due to changes in

seminal PGM type, and the authors have made no separate study of the typing of vaginal PGM." p. 30.

Defendant contends, in essence, that the PGM testing excluding him as the donor of semen found in T.J. conclusively established his innocence and that the jury's finding of guilt is, therefore, not supported by the evidence. Defendant does not go so far as to contend that such evidence mandates a directed verdict, an alien procedure in criminal cases, but, rather, that a jury in such circumstances is required to find a defendant not guilty, irrespective of other evidence in the case.

For many years it was considered proper in Kansas to instruct juries that the weight to be afforded expert testimony was to be determined by the jury. The present PIK Criminal position is found at PIK Crim. 2d 52.14, wherein it is stated:

"52.14 EXPERT WITNESS
"The Committee recommends that there be no separate instruction given on the expert as a witness.
"Comment
"See PIK 2d 250, Expert Witness and Notes on use. The Committee believes that an expert should be considered as any other witness as set forth in PIK 2d 52.09, Credibility of Witnesses."

PIK Crim. 2d 52.09 states:

"52.09 CREDIBILITY OF WITNESSES
"It is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use common knowledge and experience in regard to the matter about which a witness has testified.
"Notes on Use
"This instruction should be given in every criminal case. See K.S.A. 22-3415, Laws applicable to witnesses. See K.S.A. 60-417, Disqualification of witness; interpreters. See also K.S.A. 60-419, 420, 412 and 422 covering necessity of knowledge or experience on the part of a witness, evidence relating to credibility, limitation on evidence of conviction of crimes and other limitations on admissibility of evidence affecting credibility."

The witness credibility instruction given herein was as follows:

"INSTRUCTION NO. 11
"It is for you to determine the weight and credit to be given to the testimony of each witness. You have a right to use the knowledge and experience which you possess in common with persons in general, in regard to the matter about which a witness has testified. You may take into account the ability and opportunity to observe and know the things about which they have testified, memory, manner,

and conduct while testifying, and interest they may have in the result of this trial, and the reasonableness of their testimony considered in the light of all the evidence in this case."

No complaint is made as to the form of this instruction.

The transcript of T.J.'s testimony shows her to be a strong, credible witness. A cautionary eyewitness instruction was given. The jury obviously chose to believe T.J. and other incriminating testimony rather than the expert witness. Under the law of Kansas as reflected in the instruction given, the jury had the right and duty to determine the weight and credit to be given the testimony of each witness. Do the rather unique circumstances presented herein operate to deprive the jury of its right to determine what weight shall be afforded to the testimony of each witness? We think not. Defendant's contention herein would result in the expert's conclusion that defendant was not the donor of seminal fluid found in the victim's vagina constituting an absolute legal bar to a conviction of the crime of rape and the robbery herein, irrespective of any other evidence admitted. Expert witnesses cannot be the ultimate determiners of guilt or innocence and thereby usurp the role of the jury under our system of jurisprudence. There was substantial competent evidence supporting the convictions of the crimes committed in the T.J. incident and, accordingly, the convictions cannot be disturbed upon appeal when challenged on sufficiency of the evidence grounds.

The judgment is affirmed.