No. 60,939

STATE OF KANSAS, *Appellee*, v. ROBERT LYNN LUCAS, *Appellant*.
(759 P.2d 90)

Opinion filed July 8, 1988.

*Karen Mayberry,* assistant appellate defender, argued the cause, and *Rosanne Piatt,* assistant appellate defender, and *Benjamin C. Wood,* chief appellate defender, were on the briefs for appellant.

*Michael B. Buser,* assistant district attorney, argued the cause, and *Robert T. Stephan,* attorney general, and *Dennis W. Moore,* district attorney, were with him on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, J.: Robert Lynn Lucas appeals his jury trial convictions of two counts of child abuse, K.S.A. 1987 Supp. 21-3609, (one count as to victim Shannon Woodside and one count as to victim Shaina Woodside) and one count of felony murder, K.S.A. 21-3401, as to victim Shaina Woodside. Lucas was sentenced to three to eight years' imprisonment on each count of child abuse and to life imprisonment for felony murder.

At the times of the crimes of which defendant was convicted, he was living in Olathe with Jean Woodside and her two daughters, Shaina (age 18 months at the time of her death) and Shannon (age 3 years). Mrs. Woodside worked three evenings a week and attended school the other four evenings. Defendant had the children in his care every evening and frequently in the daytime. At approximately 10:30 p.m. on July 6, 1986, defendant called 911, the emergency number, to request medical assistance for Shaina. First on the scene was Officer James Stover. He found the defendant in an upstairs bathroom standing over the unconscious body of Shaina. Shannon was in the bathtub. Officer Stover carried Shaina downstairs and observed she was not breathing and had no pulse. He commenced CPR. A Med-Act unit arrived and Shaina was taken to a local hospital. Officer Stover asked defendant what had happened and defendant gave a lengthy detailed account of how he had placed the two little girls in the tub for their evening bath, shut the glass shower doors, and gone downstairs to watch television. Sometime later he had returned upstairs to check on the children and had found Shaina floating face down in the tub. His efforts at CPR were

unsuccessful, but the child vomited up her dinner along with a toothpaste tube cap. Thereafter he went downstairs and telephoned the child's mother, requesting that she return home. Defendant then called 911.

After the child had been taken to the hospital, Officer Stover stayed at the residence with the defendant. Upon Mrs. Woodside's arrival, the three went to the hospital. The child was pronounced dead at the hospital. A number of suspicious injuries were observed on her body at the hospital, including patterned burns on her buttocks, three burns resembling cigarette burns on other parts of her body, severe fresh lacerations to her nipples, and numerous bruised areas on many different parts of her body. At this point Detective Joseph Pruett, an experienced investigator of homicide and child abuse cases, was sent to the hospital where he viewed Shaina's body. As per his prior instructions from his Chief of Detectives, Captain John Bunker, Detective Pruett escorted defendant to the Olathe Police Station for an interview. This interview will be discussed in greater detail in one of the issues raised herein. Immediately thereafter, defendant was arrested on a charge of child abuse as to Shaina. The cause of death had not been determined at this time.

The following afternoon an autopsy was performed which showed Shaina had suffered severe multiple blows to the head, one of which had hemorrhaged ¾ inch past the arachnoid, the thin covering of the brain. The coroner testified the sub-arachnoid hemorrhage could have caused Shaina to lose consciousness. The head injuries appeared to have been inflicted near the time of death. The coroner testified Shaina's body showed injuries which were the "characteristic stigmata that one sees in child abuse." He found it probable Shaina had met her death by losing consciousness in a body of water and drowning. The head injuries were first disclosed during the autopsy.

Further investigation and trial evidence revealed a real-life horror story of abuse inflicted by the defendant on both little girls over a period of time, directed particularly at Shaina. The evidence relative to the abuse of Shannon will be discussed in a separate issue. There was evidence that defendant had, prior to July 6, 1986, beaten Shaina severely with a heavy leather belt, poured Tabasco sauce down her throat, set her down on a hot stove burner, and repeatedly pinched and bitten the child. While

in his care Shaina's arm had been broken. A few days before Shaina's death, Mrs. Woodside had observed Shaina in a dazed condition while in the bathroom with defendant. Defendant told her that he had "tranked" the child. He explained this consisted of holding his hand over the child's face until she passed out from lack of oxygen. He further stated he had used this form of "discipline" on his child of a previous marriage. He generally explained Shaina's injuries, when observed by others, as arising from accidents or efforts at discipline.

Defendant was charged with and convicted of child abuse as to Shannon and child abuse and felony murder as to Shaina. The matter before us is defendant's direct appeal from these convictions.

For his first issue, defendant contends the district court erred in failing to dismiss the charge of felony murder as the child abuse charge merged into the felony murder and could not constitute the requisite collateral felony to support the felony-murder charge.

The Kansas felony-murder statute is K.S.A. 21-3401, which provides:

"Murder in the first degree is the killing of a human being committed maliciously, willfully, deliberately and with premeditation *or committed in the perpetration or attempt to perpetrate any felony.*" (Emphasis supplied.)

As we stated in *State v. Lashley*, 233 Kan. 620, 664 P.2d 1358 (1983):

"A literal reading of this statute would find any felony to be sufficient to support a charge of felony murder if a causal relation exists. The purpose of the statute is to deter those engaged in felonies from killing negligently or accidentally, and that doctrine should not be extended beyond its rational function which it was designed to serve." 233 Kan. at 631.

In Kansas, as in many other states, the application of felony murder has been limited by judicial decision to situations where: (1) the underlying felony is inherently dangerous to human life; and (2) the elements of the underlying felony are so distinct from the homicide as not to be an ingredient of the homicide. See *State v. Lashley*, 233 Kan. 620, and Annot., 40 A.L.R.3d 1341.

In determining whether a particular felony is inherently dangerous to human life so as to justify a charge of felony murder, the elements of the underlying felony should be viewed in the abstract, and the circumstances of the commission of the felony

should not be considered in making the determination. *State v. Underwood*, 228 Kan. 294, 306, 615 P.2d 153 (1980).

K.S.A. 21-3110(8) states:

" 'Forcible felony' includes any treason, murder, voluntary manslaughter, rape, robbery, burglary, arson, kidnapping, aggravated battery, aggravated sodomy and any other felony which involves the use or threat of physical force or violence against any person."

Clearly, all of the crimes specifically designated therein would supply the requisite underlying felony for a felony-murder conviction unless the doctrine of merger applies (discussed later herein).

In *State v. Lashley*, 233 Kan. at 633, we held that while some of the offenses defined with the theft statute (K.S.A. 21-3701) were not inherently dangerous to human life, two of the designated offenses were.

K.S.A. 1987 Supp. 21-3609 provides:

"Abuse of a child is willfully torturing, cruelly beating or inflicting cruel and inhuman corporal punishment upon any child under the age of 18 years."

Clearly, abuse of a child as defined by K.S.A. 1987 Supp. 21-3609 is a felony inherently dangerous to human life and no contrary assertion is made herein. Rather, the issue herein is whether the underlying or collateral felony is so distinct from the homicide as not to be an ingredient of the homicide. If the underlying felony does not meet this test it is said to merge with the homicide and preclude the application of felony murder. Thus, a crime such as second-degree murder may not serve as the underlying felony supporting first-degree felony murder because second-degree murder is one of the lesser included offenses of first-degree murder. Otherwise, all degrees of homicide would constitute murder in the first degree, regardless of the defendant's intention or premeditation. First-degree premeditated murder (or any lesser degree of homicide) could, of course, constitute the requisite underlying felony where, for instance, a defendant kills victim B during his or her commission of a homicide on victim A. The homicide of victim A could be the underlying felony for a felony-murder charge for the death of victim B.

In *State v. Fisher*, 120 Kan. 226, 230-31, 243 Pac. 291 (1926), we held a farmer's son who killed a four-year-old child while shooting at a trespasser could not be charged with felony murder

on the basis of an underlying felony of assault with a deadly weapon. We held the elements of the underlying felony must be so distinct from the homicide as not to be an ingredient of the homicide. The son could therefore be charged with first-degree murder, or some lesser degree of murder, but not with felony murder because the underlying felony merged with the homicide so there were not two separate felonies. There was but a single criminal act involved.

*State v. Clark*, 204 Kan. 38, 460 P.2d 586 (1969), is a case in which the defendant had been convicted of felony murder based upon the underlying felony of felonious assault. Defendant had stabbed his wife, who died as a result thereof. We held that the felonious assault was an integral part of the homicide and reversed the conviction. To hold otherwise, we said, would preclude the jury from considering premeditation in the great majority of homicide cases.

We turn now to abuse of a child as the underlying felony to support felony murder. The State relies heavily on *State v. Brown*, 236 Kan. 800, 696 P.2d 954 (1985). The *Brown* opinion is short and of special significance herein. Accordingly, the opinion as it relates to the issue before us is reproduced as follows:

"These consolidated appeals arise from defendant's conviction of involuntary manslaughter (K.S.A. 1984 Supp. 21-3404) and child abuse (K.S.A. 21-3609). The State appeals in Case No. 56,525 on a question reserved pursuant to K.S.A. 22-3602(b)(3) and the defendant appeals in Case No. 56,997 from alleged erroneous trial court rulings.

"The facts giving rise to the charges are not seriously disputed. Defendant Eileen Brown gave birth to a son, Randell Brown, on March 10, 1983. He was released from the hospital into his mother's care five days later, weighing five pounds and in good health. On April 21, 1983, defendant brought Randell Brown to the hospital where he was pronounced dead. The child was emaciated and had bruises on his head, abdomen and buttocks. Randell weighed only four pounds and three ounces on April 21, although according to expert testimony he should have weighed around seven pounds, five ounces. The pathologist who performed an autopsy on the child concluded Randell exhibited:

'1. Neglect with weight loss and fat atrophy.

'2. Evidence of abuse with healing fracture of left clavicle shoulder, abdominal bruise and right parietal skull fracture with scalp hematoma.

'3. Cerebral hematomas . . . .'

"On the day Randell died Eileen Brown gave a written statement to the police in which she admitted jerking the child by the neck because he wouldn't stop crying, shaking him, and hitting him on his face and chest; she also spoke of being under tremendous pressure living alone and trying to raise two children. Four days later she gave the police another written statement in which she

admitted feeling a great deal of anger and stress, hitting Randell on the right side of his head with her fist, and later hitting him in the chest. Following a preliminary hearing, defendant was bound over on charges of first-degree murder, abuse of a child, and aggravated battery. Prior to trial the State dismissed the charge of aggravated battery. We will consider each appeal separately.

. . . .

### Case No. 56,997

"Defendant Eileen M. Brown was tried on one count of first-degree felony murder and one count of abuse of a child. The court gave the full range of instructions on lesser included offenses of murder and the jury found defendant guilty of involuntary manslaughter and abuse of a child. For her first point on appeal defendant contends that the trial court erred in denying her motion to dismiss on grounds there was no independent collateral felony to support the felony murder charge. It is defendant's contention that the child abuse charge merged in the charge of felony murder and, having done so, no collateral felony remained to support the felony murder charge. We agree with the trial court's ruling.

"K.S.A. 21-3609, abuse of a child, was amended in 1984 but the amendment only changed the classification of the crime from a class E felony to a class D felony. The elements of the offense, which were not affected by the 1984 amendment, read:

'Abuse of a child is willfully torturing, cruelly beating or inflicting cruel and inhuman corporal punishment upon any child under the age of eighteen (18) years.'

K.S.A. 21-3401, first-degree murder, reads:

'Murder in the first degree is the killing of a human being committed maliciously, willfully, deliberately and with premeditation or committed in the perpetration or attempt to perpetrate any felony.'

"To invoke the felony murder rule there must be proof a homicide was committed in the perpetration of or an attempt to perpetrate a felony and that the collateral felony was one inherently dangerous to human life. *State v. Lashley*, 233 Kan. 620, 631, 664 P.2d 1358 (1983). However, the felony murder doctrine is not applicable when the other felony is an integral part of the homicide. *State v. Clark*, 204 Kan. 38, Syl. ¶ 1, 460 P.2d 586 (1969). In such a case the collateral felony is said to have merged with the homicide and results in only one offense. In order to make this determination, we have held:

'The proper test for determining whether an underlying felony merges into a homicide is whether all the elements of the felony are present in the homicide and whether the felony is a lesser included offense of the homicide.' *State v. Rueckert*, 221 Kan. 727, Syl. ¶ 6, 561 P.2d 850 (1977).

It is obvious from even a cursory reading of the statutes that a charge of abuse of a child does not meet the *Rueckert* test for merger into a charge of felony first-degree murder.

"We are not called upon, and do not here decide, whether a single instance of assaultive conduct, as opposed to a series of incidents evidencing extensive and continuing abuse or neglect, would support a charge of felony murder. See *People v. Smith*, 35 Cal. 3d 798, 201 Cal. Rptr. 311 (1984), and *Massie v. State*, 553 P.2d 186 (Okla. Crim. 1976). Cases supporting the doctrine that child abuse

constitutes a collateral felony that will support a charge of felony murder include *People v. Northrup*, 132 Cal. App. 3d 1027, 182 Cal. Rptr. 197 (1982); *People v. Roark*, 643 P.2d 756 (Colo. 1982); *Holt v. State*, 247 Ga. 648, 278 S.E.2d 390 (1981); *Miller v. State*, 379 So. 2d 421 (Fla. Dist. App. 1980); *State v. O'Blasney*, 297 N.W.2d 797 (S.D. 1980).

"We hold that the charge of abuse of a child did not merge into the homicide and the trial court did not err in denying defendant's motions for dismissal." 236 Kan. at 801-04.

In *Brown*, we relied on *State v. Rueckert*, 221 Kan. 727, Syl. ¶ 6, 561 P.2d 850 (1977), for the test in determining merger, iterated as follows:

"The proper test for determining whether an underlying felony merges into a homicide is whether all the elements of the felony are present in the homicide and whether the felony is a lesser included offense of the homicide."

This is a rather misleading statement as a lesser crime necessarily proved in establishing the charged crime is a lesser included offense of the charged crime. See K.S.A. 1987 Supp. 21-3107(2)(d). As we stated in *State v. Moore*, 242 Kan. 1, Syl. ¶ 1, 748 P.2d 833 (1987):

"An offense is a lesser included offense under K.S.A. [1987 Supp.] 21-3107(2)(d) when all of the elements necessary to prove the lesser offense are present and required to establish the elements of the greater offense."

In considering merger, the test is more correctly stated as being whether the elements of the underlying felony are so distinct from the homicide so as not to be an ingredient of the homicide. See *State v. Lashley*, 233 Kan. 620, as previously cited. In this context, "collateral felony" is perhaps a more meaningful term than "underlying felony" although the two terms are used synonymously and interchangeably in our opinions discussing the felony-murder doctrine.

In the case before us the abuse of a child charge, like that in *Brown*, encompassed multiple acts of abuse. Specifically, Instruction No. 11 stated:

"The defendant is charged in Count I with the crime of abuse of a child (Shaina Woodside). The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

1. That the defendant willfully tortured or cruelly beat or inflicted cruel and inhuman corporal punishment upon a child under the age of eighteen years; and
2. That this act occurred on or about the month of November, 1985, through July 6, 1986, in Johnson County, Kansas."

Instruction No. 16 provided:

"The defendant is charged in Count III with the crime of felony murder. The defendant pleads not guilty.

"To establish this charge each of the following claims must be proved:
1. That the defendant killed Shaina Woodside;
2. That such killing was done while in the commission of abuse of a child, a felony; and
3. That this act occurred on or about the 6th day of July, 1986, in Johnson County, Kansas.

The elements of abuse of a child are set forth in Instruction No. 11."

It was the State's theory that Shaina died as a result of a severe beating to her head administered by the defendant from which she lost consciousness and drowned in the bathtub. There was no claim that any of the other acts of abuse caused or contributed to her death. The defendant could have been found guilty of abuse of a child based solely on the fatal beating and convicted of felony murder solely on the fatal beating. If one and the same act can constitute both felony murder and the underlying felony, it would seem superfluous to determine if the underlying felony was inherently dangerous to human life or to consider the time, distance, and causal relationship of the underlying felony to the killing.

Had an adult been beaten on the head, lost consciousness as a result thereof, and drowned in a pool of water or been asphyxiated by his blood or vomit, we would have no hesitancy in holding that the aggravated battery (the beating) was an integral part of the homicide and that it merged therewith and could not serve as the underlying felony. Can a different result logically be reached by designating the beating as abuse of a child rather than aggravated battery? We believe not.

The facts herein are shocking, appalling, heinous, and whatever other synonym one wishes to apply. The jury could have easily concluded defendant was a vicious and sadistic person. It can be argued that special protection needs to be afforded to children and felony murder should apply where a child dies as the result of the offense of child abuse. But to so hold actually gives less protection to children. Abuse of a child is a Class D felony. Aggravated battery is a Class C felony. If abuse of a child is the highest offense for severely beating, shooting, or stabbing a child who survives the attack, the penalty would be less than for the same act committed against an adult.

Simple battery is defined by K.S.A. 21-3412 as follows:

"Battery is the unlawful, intentional touching or application of force to the person of another, when done in a rude, insolent or angry manner."

Aggravated battery is defined by K.S.A. 21-3414 as follows:

"Aggravated battery is the unlawful touching or application of force to the person of another with intent to injure that person or another and which either:

    (a) Inflicts great bodily harm upon him; or

    (b) Causes any disfigurement or dismemberment to or of his person; or

    (c) Is done with a deadly weapon, or in any manner whereby great bodily harm, disfigurement, dismemberment or death can be inflicted."

There is nothing in the aggravated battery statute limiting its application to cases where the victim is 18 years of age or older. Abuse of a child does not contain the great bodily harm requirement. Aggravated battery obviously can be committed against a child under 18 years of age.

Faced with the horror of the killing of small children by those responsible for their care, some courts have taken rather illogical positions. Particularly noteworthy in this group is *People v. Jackson*, 218 Cal. Rptr. 637 (1985). Defendant Jackson became angry with his 33-month-old son because the child, in dressing, put his pants on backwards. Defendant then beat the child with a 36″ long, 2″ thick wooden dowel rod. He then strangled the child until the boy passed out, and then resumed beating the child's head with the dowel rod. The child died from his head injuries. Defendant was convicted of felony murder with the underlying felony being child abuse. The California Court of Appeals affirmed. It recognized the merger doctrine but held it inapplicable, reasoning:

"In the instant case, we find discernible in appellant's conduct an independent, collateral purpose separate from the intent to inflict bodily harm. That purpose was to punish; to chastise; to bend the child's actions into conformity with his father's idea of propriety, and to impress upon him the virtue of obedience.

  . . . .

"While such an intent (i.e., chastisement) is not in itself a felonious one, the intent to chastise *in a 'cruel or inhuman'* (inherently dangerous) manner is felonious. Moreover, in our opinion a murder conviction predicated upon a violation of Penal Code section 273d under the circumstances here presented is entirely consistent with and well serves the public policy underlying the felony-murder rule, which is 'to deter those engaged in felonies from killing negligently or accidentally.' (*People v. Satchell* (1971) 6 Cal. 3d 28, 34, 98 Cal. Rptr. 33, 489 P.2d 1361.) Thus, conduct violative of Penal Code section 273d is always inherently dangerous, but it need not, of course, be in every instance fatal. Here the independent purpose of the underlying felony was to coerce the child

into obeying his father's will. There is, of course, nothing criminal in such purpose, and had appellant administered light corporal punishment or some other rational discipline appropriate to the circumstances, Vic, Jr., would still be alive. Only the inherently dangerous and entirely disproportionate means chosen to effectuate appellant's punitive purpose rendered his conduct felonious. Strangulation and the *first* blow to the head with a truncheon constituted felony child abuse as defined in Penal Code section 273d. Subsequent, lethal blows in our opinion rendered appellant culpable of murder by operation of the felony-murder rule; for it was precisely these subsequent blows that the rule was designed to deter." 218 Cal. Rptr. at 641-42.

Another California Court of Appeals case, *People v. Benway*, 164 Cal. App. 3d 505, 210 Cal. Rptr. 530 (1985), also decided in 1985, held merger did apply. The *Benway* court held:

"We see no reason why the felony-murder rule should apply to some—but not all—violations of section 273a, subdivision (1). For example in *Smith* [35 Cal. 3d 798, 201 Cal. Rptr. 311, 678 P.2d 886 (1984),] and *Shockley*, [79 Cal. App. 3d 669, 145 Cal. Rptr. 200 (1978),] both defendants were guilty of creating a life threatening environment for their children despite the affirmative duty imposed upon them by section 273a, subdivision (1). The only difference is that the defendant in *Smith* accomplished this result by direct physical abuse while in *Shockley* the defendant employed an indirect method. The distinction between the form of abuse does not justify disparate treatment among defendants who severely abuse children. It would make little sense to treat those who directly batter their children more leniently than those who inflict no injuries themselves but merely allow others the opportunity to do so. Therefore, we conclude all forms of felony child abuse, whether 'assaultive,' 'nonassaultive,' 'active,' or 'passive,' constitute a 'single course of conduct with a single purpose.' (*People v. Burton* (1971) 6 Cal. 3d 375, 387.) The conduct is 'an "integral part of" and "included in fact" in the homicide within the meaning of *Ireland* [70 Cal. 2d 522, 75 Cal. Rptr. 188, 450 P.2d 580 (1969)].' (*People v. Smith, supra*, 35 Cal. 3d at p. 806, fn. omitted.) Thus, when death occurs, the act or omission to act merges into the homicide.

"This result is also supported by the purpose of the felony-murder rule itself. The Supreme Court in *Smith* reiterated that 'the ostensible purpose of the felony-murder rule is not to deter the underlying felony, but instead to deter negligent or accidental killings that may occur in the course of committing that felony.' (*People v. Smith, supra*, 35 Cal. 3d at p. 807.) As in *Smith*, when a person willfully causes or permits the infliction of unjustifiable pain *or* willfully causes or permits a child to be placed in a dangerous situation under circumstances likely to produce death, 'it is difficult to see how the assailant would be further deterred from killing negligently or accidentally in the course of that felony by application of the felony-murder rule.' (*Ibid.*) Furthermore, by further restricting the application of the felony-murder rule, we comply with the Supreme Court's directive that the felony-murder rule " 'should not be extended beyond any rational function that it is designed to serve" [and should] be given the narrowest possible application consistent with its ostensible purpose . . . .' (*People v. Smith, supra*, 35 Cal. 3d at p. 803.)

"Applying the felony-murder rule in the narrowest possible way, as we must,

we are compelled to conclude there is no independent felonious design when *any* form of felony child abuse is willfully committed under circumstances likely to produce great bodily harm or death. Therefore, Benway's act of placing Raelynn in a dangerous situation must merge into the homicide. Consequently, it was error to convict Benway of second degree felony murder." 164 Cal. App. 3d at 512-13.

A number of other jurisdictions have wrestled with the same type of issue as is before us. Faced with the large variation in factual situations, felony-murder statutes, and child abuse statutes involved, these cases are not particularly helpful.

In *State v. Brown*, 236 Kan. 800, we declined to decide whether "a single instance of assaultive conduct, as opposed to a series of incidents evidencing extensive and continuing abuse or neglect, would support a charge of murder." We now conclude that a single instance of assaultive conduct will not support the use of abuse of a child as the collateral felony for felony murder when that act is an integral part of the homicide. Should this result change if the prosecution can present evidence that on one or more prior occasions the defendant directed assaultive conduct toward the same victim regardless of whether or not such other conduct was a contributing factor in the child's death? What deterrent effect would be accomplished? If an individual beats a child to death in July, what logical or legal basis is there to escalate the charge from manslaughter to first-degree felony murder based on the fact he had beaten the child several months previously? A wife-beater who ultimately batters his wife to death faces no first-degree felony murder charge simply because he may have injured his wife on previous occasions.

We conclude that, when a child dies from an act of assaultive conduct, evidence of prior acts of abuse cannot be used to escalate the charge into felony murder. Such acts could be used as additional counts of abuse of a child but the prosecutorial device of charging multiple acts of abuse of a child in one count cannot bootstrap a felony-murder charge. Any language to the contrary in *State v. Brown*, 236 Kan. 800, is disapproved.

If additional protection for children is desired, the Kansas Legislature might well consider legislation which would make the death of a child occurring during the commission of the crime of abuse of a child, or aggravated battery against a child, first- or second-degree felony murder.

For his second issue, defendant contends the trial court erred

in admitting into evidence a videotape interview of himself taken by a police officer some three hours after he had reported Shaina's death. A *Miranda* warning was given to the defendant only at the conclusion of the admitted interview, at which time defendant declined to answer any further questions. The crucial determination here is whether or not the interrogation was investigative or custodial. See *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). The determination of whether interrogation was custodial must be made on a case-by-case basis. *State v. Edwards*, 224 Kan. 266, 268, 579 P.2d 1209 (1978). The issue needs to be determined herein, as it will arise on any subsequent retrial of defendant.

We found no violation of the defendant's constitutional rights in *State v. Taylor*, 234 Kan. 401, 405-06, 673 P.2d 1140 (1983), where a husband who had reported his wife missing was asked to come to the police station at 12:10 p.m. and questioned without being restrained until suspicions developed that his wife was a homicide victim, at which time he was given a *Miranda* warning. This case has similarity to the case at bar. Here, Lucas called the police and reported the death. He was in charge of the victim. Ostensibly the child had drowned, as he had reported. It was natural that the police would interview him to help determine how Shaina had drowned. To this extent, an interview would be clearly investigatory, as it had not yet been determined a crime had been committed.

In *State v. Carson*, 216 Kan. 711, 715, 533 P.2d 1342 (1975), we listed five factors helpful in considering whether questioning constitutes custodial interrogation. Let us consider each factor in light of the facts of the case.

(1) The nature of the investigator: Lucas was questioned by a single plainclothes detective. The detective had been requested by his captain to go to the hospital, view Shaina's body, and accompany Lucas back to the police station to question him. Lucas and Woodside were not allowed to see Shaina's body. The detective drove Lucas to the station in an unmarked car. The focus was clearly on child abuse at this time. The detective had had extensive experience in homicides and child abuse and had conducted seminars on child abuse.

(2) The nature of the suspect: Lucas was an articulate adult of apparently normal intelligence. He had been described to the

detective as the person who was in charge of Shaina's care at the time of her death.

(3) <u>The time and place of the interrogation</u>: The interrogation took place at the police station at 12:45 a.m., soon after Shaina was pronounced dead. Lucas was left alone while the detective activated a hidden camera in a small interview room in a restricted area of the police station. Lucas was not told the interview would be recorded. The fact the interview was videotaped is not of much significance. It appears to be routine procedure for the Olathe police to videotape statements in such circumstances. The interview with Woodside was under similar conditions.

(4) <u>The nature of the interrogation</u>: The first 25 minutes of the interview consisted mainly of gathering detailed biographical information about Lucas, his past history, and his relationship with Woodside. The questioning then turned to the events of that night. Lucas asked to be allowed to use the restroom, but the detective told him to wait and "get through this basic story because I think the Captain will be down in just a minute and he may have a few questions for you and I want to continue with this." When Lucas asked if it would be a long wait, the detective said, "Well, as long as it takes." About 15 minutes later, after hearing Lucas' explanations for some of Shaina's injuries, the detective left to consult with his captain about arresting Lucas and Lucas was allowed a to use the restroom. He had to be accompanied by an officer because the interview room was in a restricted area in which a citizen could not walk unaccompanied.

In his testimony, the detective stated there were three distinct parts to the interview. These may be categorized as: (1) Tell me about yourself (biographical); (2) tell me how the little girl died; and (3) I saw the little girl's body and I don't believe your version of the events. Defendant was then asked about particular injuries the detective had previously observed on the dead child's body.

(5) <u>The progress of the invetigation at the time of interrogation</u>: The cause of death had not yet been determined, but child abuse was certainly suspected. Lucas was known to be the only adult with Shaina in the hours before her death. The focus of the investigation was on Lucas from the beginning of this interrogation.

We hold the video tape of the interrogation was admitted in

error in violation of *Miranda*, but in this case the error was harmless. The first part of the interrogation was purely biographical. It is neither exculpatory or inculpatory. It consists of neutral facts. The second part of the interview—how the child died—was essentially a repetition of what defendant had told Officer Stover at the house in a purely investigatory situation. The third part is a closer question, but again defendant admitted to no fault. He explained some of her injuries as accidental or done for a proper disciplinary purpose. Some injuries were not explained. Those that were explained were done so by versions he had previously told Mrs. Woodside, the child's mother. Essentially nothing material that could not have been learned from other sources was involved. The detective did not know of any child abuse aimed at Shannon and no inquiry was made as to defendant's treatment of the older child.

We conclude that it was error to admit the videotaped interview in this case, but that it was harmless error as we are satisfied that its exclusion would not have altered any of the three jury verdicts herein. *State v. Abu-Isba*, 235 Kan. 851, 859, 685 P.2d 856 (1984); *State v. Arney*, 218 Kan. 369, Syl. ¶ 2, 544 P.2d 334 (1975).

The third issue is whether the trial court erred in admitting two photographs of Shaina's skull taken during the autopsy. We accept the admission of photographs into evidence as within the discretion of the trial court unless it is shown such discretion has been abused. *State v. Kendig*, 233 Kan. 890, 893, 666 P.2d 684 (1983).

The trial court carefully inquired of the pathologist whether the injuries could be illustrated without showing the photographs with the skull cap pulled back. The pathologist replied they could not, as the bruising was not visible externally. This is borne out by the other photographs of Shaina's head. The two photos show the extent and location of Shaina's internal head injuries as the other photographs do not. These injuries are of particular importance because the pathologist testified they were inflicted around the time of death and it was probable that the deepest blow caused Shaina to lose consciousness in the bathtub. The number, severity, and location of the bruises show it was extremely unlikely Shaina could have sustained those injuries by falling down the stairs, or by falling once in the bathtub.

The court explained to the jury, following the presentation of the two photographs, that they were necessarily introduced in order to show the nature and extent of Shaina's injuries.

Although special care must be taken in admitting photographs taken after the pathologist has intervened, lest the evidence be made more grisly than necessary, those photographs which are relevant and material in assisting the jury's understanding of medical testimony are admissible. See *State v. Yarrington*, 238 Kan. 141, 144, 708 P.2d 524 (1985). The photographs in question were unquestionably helpful in showing the actual extent of Shaina's head injuries, which was not evident otherwise. The pictures were structured only to serve their proper purpose and were not introduced for shock purposes. We find no showing of abuse of discretion in the trial court's admission of the photographs into evidence.

The final issue is a challenge to the sufficiency of the evidence supporting the defendant's conviction of child abuse as to the surviving child, Shannon. When the sufficiency of the evidence is challenged, the standard of review on appeal is whether the evidence, viewed in the light most favorable to the prosecution, convinces the appellate court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Grubbs*, 242 Kan. 224, Syl. ¶ 1, 747 P.2d 140 (1987); *State v. Dressel*, 241 Kan. 426, Syl. ¶ 1, 738 P.2d 830 (1987); *State v. Bird*, 240 Kan. 288, 298, 729 P.2d 1136 (1986).

There was evidence showing that defendant had pinched Shannon's nipples so fiercely she cried and could not be consoled; that he whipped her so severely that she had purple bruises from her lower back to her upper legs which remained visible for over a week; and that he placed her in an unheated room in the wintertime without clothing, food, or drink for over five hours. We have no hesitancy in concluding that defendant's challenge to the sufficiency of the evidence as to his conviction of the child abuse of Shannon is wholly without merit.

Defendant's conviction of abuse of a child, Shannon Woodside, (Count II) is affirmed; defendant's convictions of felony murder (Count III), and abuse of a child, Shaina Woodside, (Count I) are reversed and the case is remanded for further proceedings.

HERD, J. dissenting: The facts in this case do not justify

overruling of *State v. Brown,* 236 Kan. 800, 696 P.2d 954 (1985). To establish this point, I shall repeat a statement of the facts in more detail than is in the majority opinion. The appellant, Robert Lucas, is a cruel, sadistic person. He vented those tendencies on Shaina and Shannon Woodside while babysitting, ultimately killing Shaina.

Witnesses testified to innumerable incidents of cruelty by Lucas to the two little girls during the last several months before Shaina's death. A former babysitter, Debbie Moore, testified Lucas often told Shaina she was ugly and told Ms. Moore to pour Tabasco sauce down Shaina's throat if she bit anyone. Lucas had a fixation on biting. One time when he came to pick up the girls from Ms. Moore, he called for Shannon to come to him and asked her if Shaina had bitten her. Shannon said Shaina had not. Lucas repeated the question and received another denial. He then caught her off guard by asking, "Where did she bite you?" Shannon pointed to her arm. Lucas thereupon called Shaina into the room and bit her so hard she had a bruise the next day. Ms. Moore said she had seen Lucas bite Shaina another time. She also said she had seen Lucas scare Shaina by making an ugly face at her. He explained he was doing this to demonstrate "he meant business" and that they had to mind him. Ms. Moore testified that Lucas said, "I love to intimidate that child and make her cry." When Shaina would run to Ms. Moore for comfort, Lucas would admonish Ms. Moore by saying, "Please don't pick her up. We're trying to break her of the habit of being babied all the time and picking her up when she wants to be picked up all the time and be held." He was saying this about an eighteen-month-old baby. Once, when the girls arrived at Ms. Moore's house, Shannon had a black eye and Shaina had a large bruise on the back of her leg and on her cheekbone. Shannon explained her bruises by saying she had fallen, but when asked about Shaina's she blurted out, "Robbie," then would say no more.

Mrs. Woodside, her sister, and her parents testified Lucas once beat Shannon so hard with a belt she was bruised purple from her lower back to her thighs for well over a week. Woodside told of an incident in January when Shannon wet her pants. As Lucas approached Shannon threateningly, she began to cry and asked if he was going to beat her again. Lucas stripped her clothes off, put her in a diaper, and placed her on the floor in an unheated

room. She remained there for four hours until her grandmother came and dressed and fed her. As soon as the grandmother left, Lucas undressed Shannon and returned her to the cold room until Woodside came home.

The grandmother testified the girls were deathly afraid of Lucas; that Shaina would cry whenever Lucas picked her up, and if anyone else was around she would put her arms up, pleading to go to them. Woodside's sister said Lucas repeatedly gave Shaina hard pinches to her chest and bottom, making her cry.

Lucas also broke Shaina's arm, but he had a ready explanation. He said she slipped when he held her up in the shower and he had to grab her arm. Several weeks later, Woodside found burns on Shaina's bottom. Lucas said he had spanked her. When asked why they looked like burns, he said he had accidentally set her on the stove burner when he was distracted by Shannon and the telephone.

On July 5, Woodside found a burn on Shaina's hip and bruises around her thighs. Lucas had his usual ready explanation. He said he had playfully snapped her with a washcloth and she had fallen into his cigarette.

The "tranking" incident, described in the majority opinion, occurred the next morning. Shaina was killed that evening. When her mother left for work on July 6, Shaina's only apparent injuries were burn marks on her bottom, bruises on her thighs, a cigarette burn, a cut on her lip, a scratch on her nose, and a scar on her chin. At about 10:30 p.m., when the emergency medical crew arrived, Shaina was found to have numerous scars from burns on her buttocks which appeared to have been made by a V-shaped instrument, and bruises on her hips, legs, arms, spine, neck, and face. She had cigarette burns on her abdomen and her nipples were lacerated. In addition, there were injuries to her head which caused her to lose consciousness and drown in the bathtub.

Thus, we can see Robert Lucas continuously tortured this eighteen-month-old baby over a period of at least a month, and ultimately caused her premature death.

I am dissenting to the majority opinion for its misplaced reliance on merger to grant this child killer a new trial. Lucas was properly convicted of felony murder.

The legislature defines murder in K.S.A. 21-3401 as:

"Murder in the first degree is the killing of a human being committed maliciously, willfully, deliberately and with premeditation or *committed in the perpetration or attempt to perpetrate any felony.*"

Under constitutional democracy with its division of powers, the power to define and punish crimes rests in the legislature. There is a wide latitude on the part of lawmakers to define an offense and to exclude elements of knowledge from its definition. 22 C.J.S., Criminal Law § 11.

The legislature established felony murder as a crime. Its purpose was to make all persons responsible for the logical consequences of their wrongful acts even though premeditation could not be established. The judiciary's function with regard to such legislation is to rule on its constitutionality and then strictly construe any ambiguity in favor of the accused. K.S.A. 21-3401 has been found constitutional. *State v. Crump*, 232 Kan. 265, 268-69, 654 P.2d 922 (1982); *State v. Goodseal*, 220 Kan. 487, 493-94, 553 P.2d 279 (1976), *overruled on other grounds* 228 Kan. 294, 615 P.2d 153 (1980).

Felony murder is a much-criticized doctrine. In spite of the criticism, it serves a useful purpose in our concept of justice. It is a deterrent to accidental or negligent killings in the course of a felony for gain, such as arson or burglary.

Although K.S.A. 21-3401 clearly and unambiguously allows the application of the felony-murder doctrine when a killing occurs in the perpetration of "any" felony, we have judicially limited the rule in the interest of justice. The first limitation on the doctrine has been to apply the rule only in cases where the underlying felony is inherently dangerous to human life. Only in inherently dangerous felonies do we find the accused had sufficient disregard for human life to justify imposing upon him or her a conclusive presumption of *mens rea* for murder.

Similarly, we refuse to apply the doctrine where there is no actual underlying felony. Thus, our second limitation is the merger doctrine. It prevents a homicidal offense from acting as an underlying felony to support felony murder. A felony other than the killing itself must have been committed to support a felony-murder charge. For example, if a person commits the sole felony of involuntary manslaughter, that felony may not be used to support a felony-murder charge.

The third limitation is the application of the merger doctrine to nonhomicidal offenses such as assault. For example, most murders are committed by means of an aggravated battery. We have held an accused may not be charged with both murder and aggravated battery because the crime consists of one act; the murder and the battery merge. Where there is only one act, there is no separate felony to add to the equation. See, for minority positions refusing this limitation, *Robles v. State,* 188 So. 2d 789 (Fla. 1966); *Baker v. State,* 236 Ga. 754, 225 S.E.2d 269 (1976); *People v. Viser,* 62 Ill. 2d 568, 343 N.E.2d 903 (1975); *State v. Wanrow,* 91 Wash. 2d 301, 588 P.2d 1320 (1978).

There are exceptions to our use of the third limitation to the statute. If an assault ending in death were carried out by means of extended torture or kidnapping, the felony is sufficiently collateral to justify the use of its *mens rea* for murder. In *State v. Foy,* 224 Kan. 558, 582 P.2d 281 (1978), we held a burglary carried out with the sole purpose of committing an assault which ended in death was sufficient to support felony murder. See *Harris v. United States,* 377 A.2d 34 (D.C. 1977); *People v. Miller,* 32 N.Y.2d 157, 344 N.Y.S.2d 342, 297 N.E.2d 85 (1973).

One other exception under the third judicial limitation to our felony-murder statute was announced in *State v. Brown,* 236 Kan. 800. In that case, we acknowledged there were instances where the merger doctrine should be limited to the second limitation, the lesser offenses of homicide. See *Bolton v. State,* 253 Ga. 116, 318 S.E.2d 138 (1984); *Ex Parte Easter,* 615 S.W.2d 719 (Tex. Crim. App.), *cert. denied* 454 U.S. 943 (1981).

*Brown* was similar to the case at bar. It involved the death of a six-week-old baby boy who showed signs of severe neglect and abuse. His shoulder and skull were fractured and he was emaciated and bruised. Although the exact cause of death was not given, it was obviously a result of abuse. The baby's mother was charged with child abuse and felony murder. We affirmed her conviction of child abuse and involuntary manslaughter.

We did not decide in *Brown* whether "a single instance of assaultive conduct, as opposed to a series of incidents evidencing extensive and continuing abuse or neglect, would support a charge of felony murder." 236 Kan. at 803-04. By this language we distinguished continuing child abuse from the crime of assault. Lucas argues this case is distinguishable from *Brown* in

that the evidence tends to show Shaina's death resulted directly from one assault—his beating of her in the bathtub, from which she fell face down in the water. He argues the case is thus no different from other assault cases which end in death. In *Brown,* the death appeared to have been caused by the cumulative effect of multiple abuse heaped on the baby's body, whereas in this case the coroner's testimony showed ·it was probable Shaina would not have died but for the drowning.

The question which should therefore be determined in the instant case is whether a continuing course of child abuse, insufficient in itself to cause death, prevents merger of the final attack of abuse with felony murder. Lucas contends that child abuse, a crime which carries a lesser penalty than assault but, like assault, consists of violence with no other purpose but to harm, must be deemed to merge.

Our statute allows a defendant to be charged with felony murder for a death resulting from the commission of "any" felony. We have seen that the statute has only been limited by judicial decree in instances where it is unjust not to evaluate the intentions of the defendant in committing the killing.

The majority repeatedly compares the beating and death of children with that of adults to prove its logic that our limitations to the statute should apply to a continuing course of child abuse. The majority states that if the legislature feels the death of children by felonious abuse from their caretakers is a more serious concern in our society than other assaults, the legislature should enact a statute making it so. The legislature has already spoken on that issue and made all homicides resulting from commission of a felony first-degree felony murder. The majority ignores the fact that any limitation is created only by our limitation of K.S.A. 21-3401. We need only follow our precedent in *Brown* and affirm the trial court to see justice done.

In a case where the facts show continuing child abuse, the defendant has engaged in a course of conduct which no longer entitles him to judicial checks upon the statute. This was not a case of accident, self-defense, or a one-time fit of passion.

Lucas abused Shaina over and over again for a period of months. He had time to sit back and reflect as he watched her toddle around, bruised, burned, and fearful. He saw the effects of

his anger and of his strength but his conclusion upon reflection was, "I love to intimidate that child and make her cry."

We have held burglary to be sufficiently removed from homicide to prevent merger, even when its purpose was to commit an assault, because of the additional circumstances surrounding the assault which increased the danger to the victim. Here, not only was Shaina trapped in her own home, but the additional circumstance of her age placed her in great danger from those adults closest to her whom she had the right to trust to act for her ultimate good. That trust was horribly breached.

Sometime during that dreadful night, Shaina's nipples were torn, her body bruised, and her torso burned with cigarettes. Such acts of torture do not deserve the protection from the severity of the felony-murder rule given defendants charged with assault. The age of the victim and the continuing nature of the torture are the elements which distinguish child abuse from assault. These elements create a circumstance in which the danger to the victim is so great that the felony-murder doctrine is justifiably imposed.

I do not think, under the facts of this case, we are justified in overruling *Brown*. I would affirm.

Miller, and Holmes, JJ., join the foregoing dissent.