No. 64,625

STATE OF KANSAS, *Appellee*, v. JIMMIE LEE HOBBS, *Appellant*.

(807 P.2d 120)

Opinion filed March 1, 1991.

*Rebecca Holihan*, assistant appellate defender, argued the cause, and *Thomas H. Johnson*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, was on the brief for appellant.

*Debra Byrd Wagner*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Robert T. Stephan*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Jimmie Lee Hobbs was convicted by a jury of aggravated robbery (K.S.A. 21-3427), first-degree felony murder (K.S.A. 21-3401), and unlawful possession of a firearm (K.S.A. 21-4204). Hobbs received a controlling sentence of life plus three to ten years. On appeal, Hobbs claims: (1) The trial court erred in denying his request for jury instructions of the lesser included offenses of second-degree murder and voluntary manslaughter and (2) the prosecutor's remarks made during closing argument were so prejudicial as to warrant a new trial.

Donald Bass lived by himself in Wichita. When Bass failed to call his mother before retiring at 9:00 p.m. and failed to show up for breakfast the next day, his mother became worried. Mrs. Bass and a friend went to Donald's house, where they discovered his body covered with blood. His VCR and guns were missing. The police discovered no identifiable fingerprints or evidence of a forced entry into the house.

Bass' mother informed a detective that her son had mentioned that an individual named James had been at his house during the weekend prior to the murder to sell him a gold necklace. She stated that the visitor had requested to use the bathroom but her son had to refuse his request because his water pipes were frozen. On April 7, 1989, Jimmie Lee Hobbs was charged with aggravated robbery, K.S.A. 21-3427, felony murder of Donald Bass, K.S.A. 21-3401, and unlawful possession of a firearm, K.S.A. 21-4204.

The deputy county coroner, who performed the autopsy on Bass' body, testified Bass had died from injuries caused by several blows to the head. He stated there were six areas of injury to the head. He said that two of the wounds were consistent with the shape of a pipe wrench but that something other than a pipe wrench could have been used to inflict the wounds. Time of death was estimated to be prior to midnight on February 12, 1989, or as late as 5:00 p.m. the next day.

Alvin Hubbard, Hobbs' brother-in-law, testified that late in the afternoon of February 12, 1989, he took Hobbs to an apartment approximately two blocks from Bass' house. Hubbard said, though Hobbs headed in the direction toward the apartment, he did not see if Hobbs entered the apartment. Hubbard knew that Hobbs

did not have any money when he left to go to the apartment and that Hobbs was carrying a couple of pipe wrenches.

According to Hubbard, the next time he saw Hobbs was approximately an hour and a half later at Hubbard's mother's house. Hubbard stated that, in addition to the pipe wrenches, Hobbs also had a plastic sack with what "may have been a tape player of some kind" inside, two pistols, and an altered shotgun. Hubbard described one of the pistols as a .357 magnum and the other pistol as an older, small revolver in a holster.

Hobbs requested Hubbard to drive him to an illegal party house. Hubbard testified Hobbs carried the plastic sack into the house and returned thirty minutes later without it. It was later determined that while in the party house Hobbs sold Bass' VCR to Phillip Cherry.

After this transaction, Hubbard testified, they went to Hobbs' apartment, where Hobbs took a bath and asked him to throw away the clothes Hobbs had been wearing. Hubbard testified that when he asked why, Hobbs said he just thought it would be the best thing to do. When Hubbard asked Hobbs what was going on, Hobbs responded that "he thought he had to kill the son-of-a-bitch" and told of a scuffle with "old drunk ass Bass" that could have gotten out of hand.

Subsequently, Hobbs and Hubbard left Hobbs' apartment to sell the guns. Hubbard said he threw the shotgun into a canal. Jerry McCray testified that he bought the older pistol from Hobbs and later gave the police several pipe wrenches that he had received from Hobbs.

At trial, Hobbs denied going to Bass' house on February 12 or killing him. He admitted that he had the pipe wrenches, that he had tried to sell Bass a necklace, and that Bass had denied his request to use the bathroom because the pipes were frozen. Hobbs stated to the jury that Alvin Hubbard, a five-time convicted felon, testified against him to save himself.

Hobbs admitted that Alvin had dropped him off near Bass' home so he could visit friends. Hobbs testified he had the pipe wrenches when he visited the friends' apartment. According to Hobbs, he visited three different friends at their apartments prior to leaving the apartment complex and returned to Alvin's mother's house for a beer. Hobbs estimated an hour and a half had passed

from the time Hubbard had dropped him off at the apartment complex and his return to Hubbard's mother's house. According to Hobbs, the pipe wrenches were in his back pocket the entire time he was visiting friends.

Hobbs stated that later, when he and Hubbard left Hubbard's mother's house in Hubbard's car, he noticed a plastic bag containing a VCR that had not been in Hubbard's car earlier that afternoon. Hobbs stated that he and Hubbard went to Beverly's Convenience Store looking for Jerry McCray but did not find McCray there. They then went to a "good time house" that sells illegal liquor. Once inside the "good time house," at Hubbard's request, Hobbs sold the VCR to Phillip Cherry for $40. According to Hobbs, they used the money to buy beer and whiskey before returning to Beverly's Convenience Store around 9:00 p.m.

Hobbs admitted that he and Hubbard had returned to his apartment that evening, but denied taking a bath and requesting Hubbard to throw away his clothes. Hobbs stated they left his apartment and returned to Beverly's Convenience Store in an effort to locate Jerry McCray. Hobbs said it was 9:00 p.m. when he talked to McCray about buying the guns that Hubbard had asked him to sell. Hobbs testified he and Hubbard then went to the Loafer's Lounge where Hubbard sold the .357 magnum for $40 to an unidentified person.

Hobbs was found guilty on all three counts. Hobbs' motion for a new trial was denied. After the State requested Hobbs be sentenced under the Habitual Criminal Act, Hobbs received a controlling sentence of life plus three to ten years. Hobbs appeals.

Murder in the first degree is the killing of a human being committed maliciously, willfully, deliberately, and with premeditation or committed in the perpetration of or attempt to perpetrate a felony. Hobbs was charged with first-degree murder committed in the perpetration of aggravated robbery.

The purpose of the felony-murder doctrine is to deter all those engaged in felonies from killing negligently or accidentally. *State v. Hoang*, 243 Kan. 40, 42, 755 P.2d 7 (1988); *State v. Brantley*, 236 Kan. 379, 380-81, 691 P.2d 26 (1984). In felony-murder cases, the elements of malice, deliberation, and premeditation which are required for murder in the first degree are deemed to be supplied by felonious conduct alone if a homicide results. To

support a conviction of felony murder, all that is required is to prove that a felony inherently dangerous to human life was being committed and that the homicide which followed was a direct result of the commission of that felony. *State v. Hoang,* 243 Kan. at 41-42.

Although second-degree murder, voluntary manslaughter, and involuntary manslaughter are frequently referred to as lesser included offenses of first-degree murder, they are more precisely lesser degrees of the same offense. *In re Habeas Corpus Petition of Lucas,* 246 Kan. 486, 490, 789 P.2d 1157 (1990). A trial court has an affirmative duty to instruct the jury on all lesser included offenses established by the evidence. An instruction on a lesser included offense must be given even though the evidence supporting the lesser offense may not be strong or extensive. However, the instruction need not be given if there is no evidence by which a rational factfinder might find the defendant guilty beyond a reasonable doubt of the lesser included offense. *State v. Stallings,* 246 Kan. 642, Syl. ¶ 3, 792 P.2d 1013 (1990).

Hobbs claims the court erred in not instructing the jury on the lesser included offenses of second-degree murder and voluntary manslaughter.

The general principles of law governing voluntary manslaughter are: (1) Voluntary manslaughter is the intentional killing in the heat of passion as the result of severe provocation; (2) heat of passion is any vehement, emotional excitement prompting violent and aggressive actions, and such emotional state of mind must be of such a degree as would cause an ordinary person to act on impulse without reflection; (3) defendant's emotional state of mind must have existed at the time of the act and it must have arisen from circumstances constituting sufficient provocation, *i.e.,* provocation to deprive a reasonable person of self-control and cause him or her to act out of passion rather than reason; (4) the test of sufficiency of provocation is objective; and (5) mere words or gestures, however insulting, do not constitute sufficient provocation. *State v. Guebara,* 236 Kan. 791, 796-97, 696 P.2d 381 (1985).

There is no evidence that Bass committed aggressive acts, made physical threats, or physically assaulted Hobbs while using abusive and insulting language. Hubbard's testimony that Hobbs

killed Bass because of an insult does not show sufficient provocation to require an instruction on voluntary manslaughter.

Where there is conflicting testimony as to the commission of murder in the first degree and the evidence will support a conviction of murder in the second degree, an appropriate lesser degree instruction should be given. Murder in the second degree is the malicious killing of a human being, committed without deliberation or premeditation and not in the perpetration of or attempt to perpetrate a felony. K.S.A. 21-3402. If the jury could have drawn different inferences and conclusions based on the evidence as to which degree of homicide was committed, the trial court erred in not instructing on murder in the second degree.

The general rule for giving lesser included offense instructions is not followed in the case of felony murder. In felony-murder cases the trial court is not required to instruct on all lesser included offenses. *State v. Chism*, 243 Kan. 484, 487, 759 P.2d 105 (1988); *State v. Rueckert*, 221 Kan. 727, 731, 561 P.2d 850 (1977). If the undisputed evidence is not weak or inconclusive, but instead would convince a reasonable person that a felony had been committed, instructions on lesser included offenses are not required. *State v. Chism*, 243 Kan. at 487; *State v. Marks*, 226 Kan. 704, 713, 602 P.2d 1344 (1979).

Hobbs claims that the State failed to show that the homicide followed as a direct result of the commission or attempted commission of aggravated robbery. Robbery is the taking of property from the person or presence of another by threat of bodily harm to his person or by force. K.S.A. 21-3426. Aggravated robbery is a robbery committed by a person who is armed with a dangerous weapon or who inflicts bodily harm upon any person in the course of such robbery. K.S.A. 21-3427.

Hobbs argues that the testimony does not provide any facts which indicate that he intended to rob Bass prior to Bass' death. Hobbs portrays Hubbard's testimony as showing that he was insulted by Bass slamming the door in his face and the resulting fight caused Bass' death. In contrast, the State maintains evidence supports Hobbs' conviction for aggravated robbery. It points to Hubbard's testimony that, when Hobbs was taking a bath, Hobbs asked Hubbard to throw away his clothes and told Hubbard "he

just thought it would be the best thing to do." Hobbs admitted to Hubbard that he had a scuffle with Bass that "could have gotten out of hand." Hubbard's testimony that Hobbs' response to Hubbard's question as to what was going on was "that he thought he had to kill the son-of-a-bitch." In addition to the statements, there is evidence that Hobbs sold the guns and the VCR the night of Bass' death.

Hobbs testified that he neither committed the aggravated robbery nor took the property from Bass. He never disputed that a robbery occurred, but inferred that Hubbard was the individual who had committed the crime. Here, the undisputed evidence that the crime of aggravated robbery occurred is not weak or inconclusive. The evidence convinced twelve reasonable jurors that an aggravated robbery had been committed and a death resulted; an instruction on a lesser offense of murder in the second degree was not required.

Hobbs next claims that the prosecutor's closing statements prejudiced the jury against him and deprived him of a fair trial. The prosecution is given much latitude in language and in manner of presentation as long as it is consistent with the facts and evidence. Improper remarks made in closing argument are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the defendant and to deny defendant a fair trial. *State v. McKessor*, 246 Kan. 1, Syl. ¶ 7, 785 P.2d 1332 (1990).

The following was said during the rebuttal portion of the State's closing argument:

"[PROSECUTOR]: The issue before you is did the defendant commit this crime. Well, ladies and gentlemen, this line represents everyone in the world [at this point the prosecutor drew a white line across the chalkboard]. One of those people—

"[DEFENSE COUNSEL]: Your Honor, I'm going to object to this type of closing argument, using something that's not been admitted into evidence at all.

"THE COURT: Overruled.

"[THE PROSECUTOR]: One of those people killed Mr. Bass. What do we know about that person? Well, we know, first of all, they were in Wichita, Kansas. And that is going to wipe out the majority of the population. Further, we know that whoever killed him was in the area of Mr. Bass's home right around the time he goes to bed. We have got the defendant over in that area. That's going to eliminate some people as well. What else do we know about the person that killed Mr. Bass? Well, we know that he knew Mr.

Bass. We know that because there's no signs of forced entry, there's no broken windows, there's no pry marks. Whoever went into the home was invited in the home. There's no forced entry. The defendant knew Mr. Bass, a lot of people in Wichita didn't. And that's going to eliminate even some more people. What else do we know? Well, we know that whoever was over there probably had a reason to be over there. There hasn't been any evidence that Alvin had any reason to be over there. Alvin says he doesn't know him. Mr. Bass's mother says, 'I've never head of Alvin,' and yet she knows her son so well she knows who's been over to her son's house to use the restroom. She knows the defendant was over there. Ladies and gentlemen, the defendant had a reason to be over there. He went over there to sell some pipe wrenches because Mr. Bass had problems with his plumbing. That's going to eliminate even some more people. What else do we know? Well, we know that whoever was over there was on foot. How do we know that? The items that were taken.
. . . .

"The items that were taken. The VCR could be carried. The guns could be tucked in the belt. The cigarettes could be carried. The watch could be worn. That's going to eliminate a lot of other people. And whoever killed Mr. Bass shortly after his death had his VCR, his sawed-off gun, his .357, and his watch. Ladies and gentlemen, there's no more doubt left. It's reasonable the defendant did it. Based on all the evidence, the physical evidence, circumstantial evidence, and the property, and the confirmed story of Mr. Hubbard, I would ask you to find the defendant guilty of all three counts. Thank you."

After the jury was excused to deliberate on its verdict, Bass objected, stating:

"[DEFENSE COUNSEL]: Your Honor, during the last part of Mr. Sevart's [the prosecutor's] argument, he went to a chalkboard and starting drawing on the chalkboard a line and then over the period of his argument slowly erasing different parts of that line to indicate that there is no one left to have committed this crime but Jimmie. And that was his intent. Your Honor, that whole line is—of argument by the State is burden shifting. It's showing that we don't have to—don't have to prove who did this, we just have to prove that no one else is available to do it, and that's definitely burden shifting, and it should not have been allowed. And I would just note for the record for purposes of appeal that certain things of that nature should never occur again.
"[THE COURT]: Okay. Your objection is noted. And I would add that except for the fact that the line which was drawn by Mr. Sevart was done with the—with the—not the point of the piece of chalk but with the side, I would say that your description of what he—that part of his argument and the example that he used is—is accurate. I have already ruled upon your objection, and my ruling does not change."

Based on the drawing that accompanied the prosecutor's remarks, Hobbs argues that his right to due process of law was violated as this closing argument improperly shifted the burden of proof and requires he be granted a new trial. Hobbs cites two cases, *United States v. Narciso*, 446 F. Supp. 252 (E.D. Mich. 1977), and *People v. Collins*, 68 Cal. 2d 319, 66 Cal. Rptr. 497, 438 P.2d 33 (1968), where the prosecutors' remarks based on probability were improper arguments.

In *Narciso*, after 35 patients at the Ann Arbor Veterans Administration Hospital suffered a total of 51 cardiopulmonary arrests, two government nurses were charged with and convicted of murder. In closing argument the prosecution discussed 43 factual circumstances proving guilt beyond a reasonable doubt, but the final reason provided by the prosecutor was determined on appeal to be beyond the bounds of proper argument. The prosecutor's argument to the jury on the 44th reason was:

"What are the odds, ladies and gentlemen, what is the chance, what is the probability that these defendants have engaged in these activities and that all these factors that are incriminating could exist and the defendants would still nevertheless be innocent." *United States v. Narciso*, 446 F. Supp. at 323.

In *People v. Collins*, 68 Cal. 2d 319, the California Supreme Court reversed a robbery conviction, finding the trial court erred in admitting expert testimony from a college mathematics professor. The professor's testimony was based on a probability analysis that the crime was committed by a couple answering to the very characteristics of the defendants—black bearded man driving a yellow car accompanied by a white, blonde pony-tailed female. The professor told the jury there was but one chance in twelve million that anyone other than the defendants could have committed the crime. *People v. Collins*, 68 Cal. 2d at 325. The California court found that no mathematical theory of probability can prove beyond a reasonable doubt that the accused is the only person with these distinctive characteristics. *People v. Collins*, 68 Cal. 2d at 330. The cases cited by Hobbs are not analogous to the facts of this case.

In a criminal case the burden of proof is placed upon the State. Speculation based on probability or statistical or mathematical calculations is insufficient to prove guilt beyond reasonable doubt.

Hobbs' reasoning would be correct if the State had relied on a probability analysis of the facts to prove the defendant's guilt. Nothing in the closing argument by the State resulted in assertions calculated to mislead the jury. Nor does the argument used by the State of narrowing the population based on evidence presented at trial rise to the level of a statistical population hypothesis as argued by Hobbs.

Under the facts of this case, the State's closing remarks were not so gross or flagrant as to prejudice the jury against Hobbs. The burden of proof was not improperly shifted to Hobbs by the State's closing statement.

Affirmed.