No. 72,055

STATE OF KANSAS, *Appellee,* v. LAFAYETTE ALAN GAYDEN, *Appellant.*
(910 P.2d 826)

Opinion filed January 26, 1996.

*Benjamin C. Wood,* special appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the brief for appellant.

*Rodney H. Symmonds,* county attorney, argued the cause, and *Carla J. Stovall,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Defendant Lafayette Gayden was convicted by a jury of one count of first-degree murder, one count of attempted voluntary manslaughter, one count of possession of cocaine, four counts of aggravated battery, and one count of carrying a concealed firearm. He was sentenced to consecutive terms of imprisonment totaling life plus 68 months in prison and 1 year in jail. Issues raised on this direct appeal do not pertain to the drug charge.

There is no dispute as to the relevant facts. The night of December 4, 1993, a number of the people patronizing the upstairs section of Bruff's, a bar in Emporia, knew one another. Cindy Grant and her husband, Alexander Grant, were there, as were friends Faylene Carter, Faylene's date Darrell Murray, and defendant, who was there with his date Nicole Black, Alexander's cousin.

Sometime shortly after midnight, Darrell and Faylene went out on the dance floor together. Defendant, Nicole, and Cindy remained seated in their booth. When Alexander Grant arrived at Bruff's after work, he went to the booth where they were sitting. Darrell and Faylene were arguing as they were seen coming off the dance floor. Faylene testified that she had responded jealously when Darrell removed another woman's hat. She poked his face with her finger, telling him he was no good, and then she slapped him. As she walked away, he slapped the back of her head.

Next, Darrell pushed Faylene down into a booth close to where the others were sitting. Cindy testified that Darrell grabbed Faylene and forcefully pushed or threw her down into an adjacent booth. Alexander Grant also described Darrell's pushing Faylene into the booth. He added that there were other people seated in the booth and that Darrell grabbed Faylene by the neck and "just pushed her on the people [who] were sitting there." Faylene testified that, after she slapped Darrell and turned her back, he slapped the back of her head, grabbed her, and pushed her down in a booth. She also thought that he might have slapped her again.

According to Faylene, Darrell told her never to hit him again. He immediately walked away from her and toward the booth where defendant sat. According to Cindy, without saying anything to Faylene, Darrell left her and approached defendant in an angry, violent-looking manner. Although at trial Cindy denied hearing defendant say anything, she testified that shortly after the incident she told police that defendant had said, "that was my cousin." Officer Michael J. Heffron testified that Cindy had approached him at the hospital at approximately 2 to 2:30 a.m. on December 5, 1993, and said that she wanted to give a statement. At that time she told him that defendant "stood up and said, '[D]on't be doing that to my family.'"

Cindy testified that Darrell was really upset and looked like he wanted to fight with defendant when he walked over to stand directly in front of him. She described Darrell as "buffing" defendant. Asked to elaborate, she said: "Something like that where they do their hand up and they go like that, you know, trying to intimidate somebody." She said that Darrell thrust his chest up and out. She further testified, "Well, I thought Darrell Murray was gonna hit [defendant] in some kind of way. And he pushed, [defendant], pulled—and Nicole off of him." Although the meaning of this testimony is unclear, it might have been interpreted to mean that Darrell pushed defendant.

In her statement to Officer Heffron, Cindy said that, in response to defendant's remark about his family, Darrell looked at him and said, "[W]hat are you gonna do about it?" She also said that at that time "she thought they were going to go man to man," which Officer Heffron interpreted to mean "fight it out with fists." When making her statement to the officer, she did not mention Darrell reaching toward or touching defendant.

Alexander Grant testified that Darrell came to within 3 to 4 feet of defendant; asked defendant something like, "[W]hat's you gonna do"; "puffed" himself up into an intimidating, challenging stance; and, when defendant started to stand up, told him to "sit his punk ass down." Alexander also testified that Faylene placed herself between Darrell and the booth where defendant was seated.

Faylene, too, testified that she went over to stand between Darrell and defendant. In addition, she testified that Nicole also was between the two men. Cindy testified that Nicole was sitting on defendant's lap.

One of Bruff's employees testified that he saw a standing man lean over a woman and try to strike a man sitting in the booth. Although in an earlier statement and testimony he had not expressed the opinion that physical contact was made and he still was uncertain, at trial he testified that he thought the standing man's swing touched the sitting man. The sitting man pulled a gun with his right hand and shot at the standing man.

Faylene testified that she told Darrell to go on, but that "[h]e wasn't gonna go, he wanted to fight [defendant]." Darrell pushed her out of the way, and then she heard a gunshot.

Alexander testified that defendant "pulled the gun and started shooting." Alexander did not see from where the gun was pulled. Cindy said that she thought defendant pulled the gun out from "his waist." She told Officer Heffron that "[defendant] reached in the front of his pants and pulled out a gun and started shooting at Murray."

Darrell testified that, as he and defendant were standing a few feet apart with Nicole between them, he took a swing at defendant and missed him. Defendant reached into his pants, pulled out a gun, and pointed it at Darrell's head. Darrell saw a flash of light, which momentarily blinded him, and he felt his face burning. A photograph taken at the hospital shows red powder burn marks on the left side of his face. The condition of his skin indicates that the gun was fired at very close range.

Darrell fell to the floor. He testified that he "got right back up." Either as he was getting up or as he was running away from defendant, Darrell was shot through the arm. Darrell testified that he heard one more shot as he ran through the hallway and two more while he was on the stairs. He was not hit after being shot through the arm.

Alexander testified that he saw defendant point the gun at Darrell's head and shoot. Darrell went down toward the ground but began turning to run before he hit the floor. Alexander saw defendant shoot at Darrell a second time. Defendant ran after Darrell, and Alexander remembered hearing one other shot from the stairs. Faylene testified that she saw defendant running after Darrell and shooting at him.

Jayson Adams and his wife, Kyla, were seated at a table near the dance floor. When he heard gunfire and realized what it was, he pushed her to the floor. Four or five shots were fired. When the shooting stopped and Kyla did not respond to his words or touch, Jayson realized that blood was pouring from a hole in her neck. Kyla was pronounced dead at the hospital after resuscitation efforts failed. Her death was caused by the bullet wound to her neck.

Also treated at the hospital were Earlene Thomas, Shawn Ellis, Darrell Murray, and Clarence Paschal. Darrell had a gunshot wound to his left arm with multiple fractures of the humerus.

Defendant was on foot and carrying a revolver in his hand when he was spotted by police. He dropped the gun when told to do so. He also dropped bullets which he had in his other hand. People who had been at Bruff's arrived soon and identified him as the person who had fired shots in the bar. The jailer who booked defendant testified that she found in his wallet a white cube in a plastic bag. The substance was cocaine.

We first consider whether the attempted voluntary manslaughter of Darrell Murray can be the collateral felony to support the felony-murder conviction for the death of Kyla Adams. Defendant was charged with the attempted first-degree murder of Murray and with the felony murder of Adams. Statutes in effect at the time provided that "[m]urder in the first degree is the killing of a human being committed . . . [i]ntentionally and with premeditation," K.S.A. 1993 Supp. 21-3401(a), and that "[a]n attempt is any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof," K.S.A. 1993 Supp. 21-3301(a). The felony-murder statute provided: "Murder in the first degree is the killing of a human being committed . . . in the . . . attempt to commit . . . an inherently dangerous felony." K.S.A. 1993 Supp. 21-3401(b). Inherently dangerous felony is defined as including murder in the first degree, murder in the second degree, and voluntary manslaughter. K.S.A. 1993 Supp. 21-3436(a)(1)-(3).

With regard to Murray, the jury was instructed that it could find defendant "guilty of attempted murder in the first degree, attempted murder in the second degree, attempted voluntary manslaughter, or not guilty." The jury was instructed on the elements of the lesser included offenses. With regard to Adams, the jury was instructed that the following claims must be proved in order to establish the charge of felony murder: "1. That the defendant killed Kyla Renee Adams; 2. That such killing was done while committing an inherently dangerous felony, to-wit: attempted murder in the first degree, attempted murder in the second degree or attempted voluntary manslaughter." In addition, PIK Crim. 3d 56.09 was given: "When a homicidal act is directed against one other than the person killed, the responsibility of the actor is exactly as it

would have been had the act been completed against the intended victim." The jury found defendant guilty of the attempted voluntary manslaughter of Murray and guilty of the felony murder of Adams.

Defendant argues that the offense of attempted voluntary manslaughter will not support the felony-murder conviction, which was based on transferred intent. He concedes that this argument was not raised in the trial court. He views this as a matter of jury instruction and, accordingly, advocates that the standard of appellate review is "clearly erroneous."

Defendant relies on the wording of the pattern instruction for the killing of an unintended victim. PIK Crim. 3d 56.09 advises the jury that where A intends to kill B but actually kills C, A is just as responsible for the death of C as he would have been if he had killed B. In other words, A's intent to kill applies to his killing C. Defendant construes the pattern instruction to mean that, in these circumstances, A cannot be any *more* responsible for the death of C than he would be if he had killed the intended person, B. Here, the jury convicted defendant (A) of attempted voluntary manslaughter of Murray (B) and of first-degree murder, on a felony-murder theory, of Adams (C). Defendant's contention is that he is improperly being held more culpable for Adams' death than he would have been if he had killed Murray.

Defendant's reliance on the language of a pattern instruction is augmented only by his citing *State v. Moffitt*, 199 Kan. 514, 431 P.2d 879 (1967). His reliance is misplaced. In *Moffitt*, the defendant was found guilty of possessing a pistol after conviction of a felony and of first-degree murder in using the pistol to kill a stranger. The court stated:

"It is no defense to the crime of murder in the first degree that the appellant may have mistaken [the deceased] for some other person . . . .

"The fact that the homicidal act was directed against one other than the person killed does not relieve the slayer of criminal responsibility. It is generally held that such a homicide partakes of the quality of the original act, so that the guilt of the perpetrator of the crime is exactly what it would have been had the assault followed upon the intended victim instead of another. (1 Wharton's Criminal Law and Procedure, Homicide, §193, p. 438.) The same rule applies where the felony

murder rule is asserted to sustain a conviction for murder in the first degree or felonious assault." 199 Kan. at 535.

*Moffitt* is distinguishable from the present case in that Moffitt was not charged with a crime against the intended victim of his rampage, as defendant was in the present case. Nor was there a comparison of severity of offenses. The substance of this court's statement was that the killing of X during perpetration of an intended crime against Y is a crime, even though it was unintended. Read in the context of the facts in *Moffitt*, the statement was not a comment on degrees of culpability but, rather, meant that the perpetrator would be held criminally accountable for the death of X.

What defendant postulates is a conflict between the legal doctrines of transferred intent and felony murder in the circumstances of his case. A review of application of the felony-murder principle by this court and relevant statutory provisions leads to the conclusion that there is no such conflict and thus no merit to defendant's argument. K.S.A. 1993 Supp. 21-3401 provides in part:

"Murder in the first degree is the killing of a human being committed:
(a) Intentionally and with premeditation; or
(b) in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 1993 Supp. 21-3436 and amendments thereto."

Killing a person while perpetrating or attempting to perpetrate another offense has long been recognized in the courts of Kansas as potentially constituting first-degree murder. See, *e.g., State v. Fisher*, 120 Kan. 226, 243 Pac. 291 (1926), and other cases discussed at *State v. Jones*, 257 Kan. 856, 864-69, 896 P.2d 1077 (1995). This court often has stated that, under the felony-murder principle, the State is relieved of the necessity of proving deliberation, malice, and premeditation, which are otherwise required for first-degree murder because they are deemed to be supplied by the felonious conduct. See, *e.g., State v. Guebara*, 220 Kan. 520, 553 P.2d 296 (1976), and *State v. Goodseal*, 220 Kan. 487, 553 P.2d 279 (1976). The most significant modification which has been made in this court's application of the felony-murder rule appeared in *State v. Underwood*, 228 Kan. 294, 615 P.2d 153 (1980). There, the court overruled the specific holdings of several earlier cases

(including *Moffitt*, *Guebara*, and *Goodseal*) in concluding that unlawful possession of a firearm by a defendant was not the sort of inherently dangerous felonious conduct which would support a felony-murder conviction. 228 Kan. at 300-07. Although this court previously had required that the collateral felony be inherently dangerous to human life, the change announced in *Underwood* reflected the court's evolving perception of what constituted inherently dangerous conduct. Reasoning that it is the use of a firearm rather than its possession which is inherently dangerous, the court concluded that intent which encompassed deliberation, malice, and premeditation could not be found in the felonious conduct of unlawful possession of a firearm. 228 Kan. at 303-04. Subsequently, the legislature amended the first-degree murder statute so that the felony-murder provision specified that the underlying felony must be inherently dangerous. L. 1992, ch. 298, § 3. In the same session, the legislature identified which felonies were inherently dangerous. L. 1992, ch. 298, § 77. K.S.A. 1993 Supp. 21-3436 is the version of the list of inherently dangerous felonies which applies in the present case, and it includes "voluntary manslaughter under section (a) of K.S.A. 21-3403 and amendments thereto." K.S.A. 1993 Supp. 21-3436(a)(3).

There are two independent theories of transferred intent at work in any case, like the present one, which involves felony murder and a homicidal act that results in the killing of someone other than the intended victim. One is the foundation of the felony-murder rule:

"The felony murder rule has logic based on the theory of transferred intent. The malicious and premeditated intent of committing the inherently dangerous collateral felony is transferred to the homicide to supply the elements of malice and premeditation without further proof. Consistent with this thinking, most courts require that the collateral felony be inherently dangerous for the felony murder rule to be applicable." 2 Wharton's Criminal Law § 146, p. 210 (14th ed. 1979).

In *Underwood*, 228 Kan. at 303, the court quoted from Wharton:

" 'In the typical case of felony-murder, there is no malice in "fact," express or implied; the malice is implied by the "law." What is involved is an intended felony and an unintended homicide. The malice which plays a part in the commission of

the felony is transferred by the law to the homicide. As a result of the fictional transfer, the homicide is deemed committed with malice; and a homicide with malice is common law murder.' 2 Wharton's Criminal Law § 145, p. 204 (14th ed. 1979)."

The other theory is the transfer of intent from one person to another, which is the subject of PIK Crim. 3d 56.09.

Defendant's specific contention is that the greatest offense he can be convicted of for the death of Adams is voluntary manslaughter because that is the felonious conduct which the jury found him guilty of directing toward the intended victim, Murray. K.S.A. 1993 Supp. 21-3401 and K.S.A. 1993 Supp. 21-3436 expressly provide otherwise. They make the killing of a human being, which is committed in an attempt to commit voluntary manslaughter, murder in the first degree. In more general terms, under 21-3401 and 21-3436, the killing of a human being committed in the commission or attempt or flight from any of the specified felonies is murder in the first degree. That *is* the felony-murder rule. It is the rule which is based on the theory of transferred intent, as discussed in the excerpt from *Underwood* quoted in the preceding paragraph. The transferred intent instruction of PIK Crim. 3d 56.09, which defendant contends is in conflict with the felony-murder rule, is instead utilized in charging premeditated and intentional first-degree murder where there is a killing of someone other than the intended victim. See, *e.g., Moffitt*, 199 Kan. at 535. In that case, the intent and premeditation are transferred to the killing of the bystander or unintended victim. See, *e.g., State v. Jones*, 257 Kan. at 860. In the present case, defendant was charged with the felony murder of Adams, and PIK Crim. 3d 56.09 is not relevant to that determination.

In *Jones*, the victim was a bystander killed in the exchange of gunfire between rival gang members. One count of first-degree murder was filed against Jones, charging him with killing the bystander intentionally and with premeditation or, in the alternative, while attempting to commit first-degree murder of the rival gang member. Jones challenged the use of the transfer of intent as to the first alternative and the use of the attempted first-degree murder as the underlying felony for the second alternative. This court

found no merit in Jones' challenge. Although his challenge was stated in terms of merger, our holding is controlling in the present case:

"In general, the lethal act cannot serve as the independent collateral felony necessary to support a felony-murder conviction. However, this rule does not apply where the deceased was not an intended victim of the lethal act. Where, as in the present case, the attempt to kill one person results in the death of another, the collateral felony of attempting to murder is so distinct from the homicide as not to be an ingredient of it. The collateral felony of attempted murder is not a lesser included offense of the homicide, and it does not merge with the homicide. Here, the attempted murder of the rival gang member(s) is an underlying felony which will support a felony-murder charge against defendant for the death of Halley." 257 Kan. at 870.

This court's response to Jones' challenge of the jury's general verdict of guilty is also instructive on this issue:

"Defendant contends that the district court's permitting the jury to consider the felony-murder theory is error which requires reversal because it is impossible to tell from the general verdict form on which theory the jury based its finding of guilty of first-degree murder. In the circumstances of this case, however, the same evidence supports either charge, and both charges are first-degree murder. The evidence showed that defendant shot at the rival gang member(s) and killed a passerby. Under the transferred intent theory, this evidence supports the charge of first-degree intentional, premeditated murder of Halley. Under the felony-murder theory, precisely the same evidence supports the charge of first-degree felony murder of Halley committed in the attempt to commit the intentional, premeditated murder of another. Not being able to determine from the general verdict form on which theory the jury based its verdict, therefore, is immaterial. In order to reach the verdict, the jurors had to agree that the evidence necessary to support either charge had been shown." 257 Kan. at 870.

In addition to running counter to the provisions of 21-3401 and 21-3436, defendant's argument simply lacks rationality. For example, in defendant's scenario it is arguable that a defendant who kills someone in a robbery attempt could be convicted of first-degree murder on a felony-murder theory, but a person who kills someone in a voluntary manslaughter attempt could not be. This is because the scope of the transferred intent idea which defendant relies on includes only transfers of the intent to commit a homicidal act against one person to the killing of another. If a homicidal act is construed to mean an act taken in furtherance of a homicide, it

would not include most of the inherently dangerous felonies specified in 21-3436. Another anomaly is that the social purpose which often has been stated for the felony-murder rule of deterring those engaged in felonies from killing negligently or accidentally, see *State v. Lucas*, 243 Kan. 462, Syl. ¶ 1, 759 P.2d 90 (1988), *aff'd on rehearing* 244 Kan. 193, 767 P.2d 1308 (1989), would not be served by a case like the present one. See *Jones*, 257 Kan. 856. Still another anomaly results from the concept advanced by defendant that, in a case such as *Jones* where the collateral felony has not been charged, the degree of culpability for the killing arguably would be undetermined. And in a case such as the present one, where defendant was charged with attempted first-degree murder of Murray but convicted of attempted voluntary manslaughter, the degree of culpability for the killing would remain undetermined until the verdict had been reached.

Generally, the lethal act is not an independent collateral felony which will support a felony-murder conviction. However, that is not true where the deceased is not the intended victim. Here, the attempt to kill Murray resulted in the death of Adams and was an independent collateral felony, which will support the felony-murder conviction for the death of Adams.

Defendant next argues that the trial court erred in failing to instruct on the lesser included offense of attempted involuntary manslaughter of Murray and lesser degrees of murder of Adams. As to Murray, the district court instructed the jury on attempted first- and second-degree murder and on attempted voluntary manslaughter. The jury was told that the charge of attempted voluntary manslaughter would be established by proof that defendant shot at Murray "upon a sudden quarrel or in the heat of passion." The jury found that the elements of attempted voluntary manslaughter had been proved.

Defendant contends that the district court breached its affirmative duty to instruct on all lesser offenses for which there is evidence on which he might be convicted. He contends that an instruction on attempted involuntary manslaughter also should have been given. The theory of involuntary manslaughter on which defendant relies is excessive force used in the exercise of self-de-

fense, as described in *State v. Gregory*, 218 Kan. 180, 542 P.2d 1051 (1975).

*State v. Collins*, 257 Kan. 408; 893 P.2d 217 (1995), is controlling in this issue. In *Collins*, the trial court failed to instruct on attempted involuntary manslaughter as a lesser included offense of attempted first-degree murder. We concluded such failure was not error, holding:

"The language of the attempt statute, K.S.A. 1991 Supp. 21-3301(a), requires that a person possess the *specific intent* to commit the crime. Therefore, to establish the crime of attempted involuntary manslaughter the person would be required to *specifically intend* to commit an *unintentional crime*. This is a logical impossibility. Although it is possible for an actor to use excessive force in self-defense, the actor cannot unintentionally act in self-defense. We conclude that Kansas does not recognize the crime of attempted involuntary manslaughter." (Emphasis added.) 257 Kan. at 419.

For the purpose of discussing the jury instructions about the killing of Adams, defendant assumes that a felony-murder theory was proper. Relying on *State v. Hobbs*, 248 Kan. 342, 807 P.2d 120 (1991), he simply asserts that the jury also should have been instructed on lesser included offenses.

*Hobbs* does not help defendant. Hobbs' conviction of felony murder was affirmed, and his argument that the jury should have been instructed on second-degree murder and voluntary manslaughter was rejected. The court stated the following rule:

"The general rule for giving lesser included offense instructions is not followed in the case of felony murder. In felony murder cases the trial court is not required to instruct on all lesser included offenses. If the undisputed evidence is not weak or inconclusive, but instead would convince a reasonable person that a felony had been committed, instructions on lesser offenses are not required." 248 Kan. 342, Syl. ¶ 3.

The evidence of the collateral felony was neither weak nor inconclusive, and, therefore, no instructions on lesser included offenses for the felony-murder charge were required. The evidence that defendant drew his gun, pointed it toward Murray, and fired is uncontroverted. Also uncontroverted is evidence that defendant fired more than once and that, when Murray fled, defendant pursued him and continued shooting. The evidence that the offense

of attempted voluntary manslaughter occurred is not weak or inconclusive. Paraphrasing the opinion in *Hobbs*, it can be said that the evidence convinced 12 reasonable jurors that an attempted voluntary manslaughter had been committed and a death resulted; an instruction on lesser offenses of murder was not required. See 248 Kan. at 348.

Defendant next contends that an instruction on self-defense should have been given. Defendant's entire argument on this issue is as follows: "The defense requested a self-defense instruction. There was some evidence to support the giving of such instruction, as noted above. As a result, the instruction should have been given. *State v. Hill*, 242 Kan. 68, 744 P.2d 1228 (1987)." Defendant's written request for jury instructions included PIK Crim. 3d 54.17 on self-defense, which states:

"The defendant has claimed his conduct was justified as self-defense.
"A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself against such aggressor's imminent use of unlawful force. Such justification requires both a belief on the part of defendant and the existence of facts that would persuade a reasonable person to that belief."

The instruction incorporates the language of K.S.A. 21-3211, which states: "A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force."

In *Hill*, the court considered a trial court's refusal to give the requested self-defense instruction. The duty involved was stated as follows: "The trial court must instruct the jury on self-defense if there is any evidence tending to establish self-defense even though the evidence may be slight and consist solely of the defendant's testimony." 242 Kan. 68, Syl. ¶ 4. Because there was some evidence of physical aggression on the part of the deceased and some evidence of a fear of assault on the part of Hill, it was error for the trial court not to have given the requested self-defense instruction.

The district court, in the present case, found that the subjective component of the self-defense test was satisfied. The evidence led the district court judge to conclude that defendant believed that it

was necessary to defend himself against the imminent use of unlawful force by Murray. The objective part of the test, however, was found wanting. The district court judge concluded that a reasonable person would not have believed it necessary to defend himself by the use of deadly force because the confrontation was mutual and defendant's pulling and firing his gun immediately followed Murray's blow.

In reaching its decision, the district court referred more than once to *State v. Burgess*, 245 Kan. 481, 781 P.2d 694 (1989). Burgess was involved in a barroom brawl which began when Burgess or someone sitting with him used a racial epithet as Jari Wills walked past them. Thinking Burgess had spoken, Wills jabbed him several times in the chest with his finger and told Burgess not to call him that again. The fight began when someone threw a punch at Wills, and it ended within a short time when Wills was stabbed. All participants were charged with aiding and abetting second-degree murder; no one was charged as a principal. Burgess denied taking any aggressive action. Nonetheless, he challenged the trial court's refusal to give an instruction on self-defense. This court concluded that there was no evidence which would justify the use of a deadly weapon against Wills. 245 Kan. at 487. Thus, the request for the self-defense instruction was properly refused.

For the district court judge in the present case, the significance of *Burgess* was this court's quoting the following excerpt from 40 Am. Jur. 2d, Homicide § 142:

" 'As a general rule, the doctrine of self-defense cannot be invoked to excuse a killing done in mutual combat willingly entered into, although the mere fact that one who kills another who seems to be about to make a murderous assault upon him was willing to enter into a fight with the decedent with deadly weapons does not destroy his right to rely on self-defense as justification for the killing, if he acted solely for the protection of his own life, and not to inflict harm upon his adversary. But the view has been taken that one willingly entering into a mutual combat is not justified or excused in taking life unless he has withdrawn in good faith and done all in his power to avert the necessity of killing.' " 245 Kan. at 487.

According to the district court judge, the evidence clearly showed that the confrontation between defendant and Murray was mutual, that defendant stood up when Murray approached him, and that

defendant drew and fired his weapon immediately after Murray hit him.

In addition to cases relied on by the trial court, the State quotes from and discusses *State v. Marks*, 226 Kan. 704, 602 P.2d 1344 (1979). According to a prior statement given by a cofelon, the victim used a racial epithet, raised his cane, started hitting Marks, and said, "get out of my place." 226 Kan. at 712. The court stated:

> "The words purportedly used by [the victim] do *not* indicate an intent to inflict bodily harm but only to compel the defendant to leave the premises. Here the use of a gun by a young man to repel an attack by a disabled 65-year-old man with a cane would be excessive as a matter of law. It was, therefore, not improper for the trial court to fail to instruct the jury on self-defense on the basis of prior statements made by [the cofelon], the truth of which he categorically repudiated at the trial." 226 Kan. at 712-13.

*Marks* differs significantly from the present case in that the self-defense instruction was not requested by Marks' trial counsel and on appeal this court was not constrained to view the evidence in the light most favorable to the defendant, as it is here. In the present case, too, the defendant and the intended victim were not so mismatched as they were in *Marks*. It may also be worth noting that the State's theory of *Marks* was that the victim was shot in the course of an armed robbery and that Marks' defense was that he was not present when the victim was shot. Thus, due to the tremendous differences in circumstances, *Marks* offers little guidance for a decision in the present case.

Where, as here, the trial court refused to give an instruction on self-defense, the evidence supporting the instruction must be viewed on appeal in the light most favorable to the defendant. See *Hill*, 242 Kan. 68, Syl. ¶ 2. And viewing the evidence in that light, this court's task is to determine whether defendant believed that the force used was necessary to defend himself and whether facts exist which would support such a belief. See 242 Kan. at 78 (quoting *State v. Childers*, 222 Kan. 32, 48, 563 P.2d 999 [1977]).

With regard to the incident at Bruff's, the evidence generally was that Murray went from where he had pushed Faylene into a booth to stand within a few feet of defendant, who was seated in an adjacent booth. Most witnesses reported that some words were

exchanged between the two men, and there was general agreement that at least one person was at all material times between the two men. There were two witnesses who testified that Murray hit or struck at defendant, but there was no evidence that Murray was armed or appeared to be armed.

With regard to the social context in which the incident took place, the evidence showed that defendant and Murray knew one another and that a week and a half earlier, on Thanksgiving, they had played cards together at Faylene's mother's house. Cindy and Alexander Grant testified that the men seemed to be on friendly terms on that occasion. Faylene, however, testified that defendant had told her before the incident at Bruff's that approximately a month earlier Murray had threatened to kill him. She also testified that defendant did not have a reputation in the community for carrying a gun but that Murray did. Alexander testified that Murray has a reputation for carrying a gun and that the reputation is deserved. He said that it is a rare occasion when Murray does not carry a gun.

Even viewed in the light most favorable to defendant, evidence which would support a reasonable belief that deadly force was necessary to defend himself against Murray's imminent use of unlawful force is missing. There was no evidence that Murray verbally threatened to seriously harm defendant, nor was there any evidence that Murray might be inclined to or able to make good on such a threat. There was no evidence that Murray was armed or displayed a weapon. There was no evidence that Murray did more than strike one blow against defendant with his hand. There is evidence that Nicole was positioned between defendant and Murray when Murray struck at defendant, but there is absolutely no evidence that defendant's reaction was an attempt to defend her against Murray's imminent use of unlawful force.

We conclude that the district court's determination that the evidence did not support a finding that defendant's belief that shooting at Murray was necessary to defend himself against Murray's imminent use of unlawful force is correct. There is no error, therefore, in the district court's refusal to instruct the jury on self-defense.

Defendant next argues that there was insufficient evidence to support the conviction of carrying a concealed weapon. He asserts that the only evidence on the charge of carrying a concealed firearm "was that nobody saw a gun on [defendant] earlier in the evening." He contends that this evidence would not allow a rational factfinder to find him guilty beyond a reasonable doubt. The State reminds the court that in its consideration of this question, all evidence must be taken in the light most favorable to the prosecution. See *State v. Tucker*, 253 Kan. 38, Syl. ¶ 3, 853 P.2d 17 (1993).

Although the State concedes that no one testified at trial that he or she actually saw defendant pull the gun from beneath his clothing, Murray did testify that defendant "[r]eached into his pants" and "[p]ulled out a gun." Furthermore, as the State contends, there is plenty of evidence from which it reasonably may be inferred that he did so. First, no one testified that they saw defendant with a gun before he pulled it on Murray. Several witnesses expressly denied seeing a gun before the shooting incident. Faylene testified that, when she saw defendant on the dance floor before the shooting, she did not see a gun on him. Cindy Grant testified that she did not see the gun before she saw it in defendant's hand. She also testified, however, that she did not see him produce it. Officer Heffron testified that she told him that defendant "[r]eached in the front of his pants and pulled out a gun." When considered in the light most favorable to the prosecution, the evidence seems more than sufficient to convince a rational factfinder beyond a reasonable doubt that the charge of carrying a concealed firearm had been proved against defendant.

The judgment of the district court is affirmed.